# OLIVER *v.* UNITED STATES

No. 82–15.   Argued November 9, 1983—Decided April 17, 1984*

---

*Together with No. 82–1273, *Maine* v. *Thornton,* on certiorari to the Supreme Judicial Court of Maine.

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined, and in Parts I and II of which WHITE, J., joined. WHITE, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 184. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and STEVENS, JJ., joined, *post*, p. 184.

*Frank E. Haddad, Jr.*, argued the cause for petitioner in No. 82–15. With him on the briefs was *Robert L. Wilson. Wayne S. Moss*, Assistant Attorney General of Maine, argued the cause for petitioner in No. 82–1273. With him on the briefs were *James E. Tierney*, Attorney General, *James W. Brannigan, Jr.*, Deputy Attorney General, *Robert S. Frank*, Assistant Attorney General, and *David W. Crook.*

*Alan I. Horowitz* argued the cause for the United States in No. 82–15. With him on the brief were *Solicitor General Lee, Assistant Attorney General Jensen*, and *Deputy Solicitor General Frey. Donna L. Zeegers*, by appointment of the Court, 461 U. S. 924, argued the cause and filed a brief for respondent in No. 82–1273.†

†Briefs of *amici curiae* urging reversal in No. 82–15 were filed for the American Civil Liberties Union of Northern California et al. by *Eric Neisser, Alan Schlosser, Amitai Schwartz, Joaquin G. Avila, Morris J. Baller*, and *John E. Huerta;* and for the California Farm Bureau Federation et al. by *Thomas F. Olson.*

Briefs of *amici curiae* urging affirmance in No. 82–15 were filed for Americans for Effective Law Enforcement, Inc., et al. by *Fred E. Inbau, Wayne W. Schmidt*, and *James P. Manak;* for the State of California by *John K. Van De Kamp*, Attorney General, *Harley D. Mayfield*, Assistant Attorney General, and *Jay M. Bloom*, Deputy Attorney General.

A brief of *amici curiae* was filed in No. 82–1273 for the State of Alabama et al. by *Charles A. Graddick*, Attorney General of Alabama, and *Joseph G. L. Marston III*, Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Norman C. Gorsuch* of Alaska, *Aviata F. Fa'alevao* of American Samoa, *Robert K. Corbin* of Arizona, *Duane Woodard* of Colorado, *Charles M. Oberly III* of Delaware, *Robert T. Stephen* of Kansas, *Steven L. Beshear* of Kentucky, *Paul L. Douglas* of Nebraska, *David L. Wilkinson* of Utah, *John J. Easton, Jr.,* of Vermont, *Chauncey H. Browning* of West Virginia, *Bronson C. La Follette* of Wisconsin, and *Archie G. McClintock* of Wyoming.

JUSTICE POWELL delivered the opinion of the Court.

The "open fields" doctrine, first enunciated by this Court in *Hester* v. *United States*, 265 U. S. 57 (1924), permits police officers to enter and search a field without a warrant.   We granted certiorari in these cases to clarify confusion that has arisen as to the continued vitality of the doctrine.

I

*No. 82–15.* Acting on reports that marihuana was being raised on the farm of petitioner Oliver, two narcotics agents of the Kentucky State Police went to the farm to investigate.[1] Arriving at the farm, they drove past petitioner's house to a locked gate with a "No Trespassing" sign.   A footpath led around one side of the gate.   The agents walked around the gate and along the road for several hundred yards, passing a barn and a parked camper.   At that point, someone standing in front of the camper shouted: "No hunting is allowed, come back up here."   The officers shouted back that they were Kentucky State Police officers, but found no one when they returned to the camper.   The officers resumed their investigation of the farm and found a field of marihuana over a mile from petitioner's home.

Petitioner was arrested and indicted for "manufactur[ing]" a "controlled substance."   21 U. S. C. § 841(a)(1).   After a pretrial hearing, the District Court suppressed evidence of the discovery of the marihuana field.   Applying *Katz* v. *United States*, 389 U. S. 347, 357 (1967), the court found that petitioner had a reasonable expectation that the field would remain private because petitioner "had done all that could be expected of him to assert his privacy in the area of farm that was searched."   He had posted "No Trespassing" signs at regular intervals and had locked the gate at the entrance to the center of the farm.   App. to Pet. for Cert. in No. 82–15,

_____

[1] It is conceded that the police did not have a warrant authorizing the search, that there was no probable cause for the search, and that no exception to the warrant requirement is applicable.

pp. 23–24. Further, the court noted that the field itself is highly secluded: it is bounded on all sides by woods, fences, and embankments and cannot be seen from any point of public access. The court concluded that this was not an "open" field that invited casual intrusion.

The Court of Appeals for the Sixth Circuit, sitting en banc, reversed the District Court. 686 F. 2d 356 (1982).[2] The court concluded that *Katz,* upon which the District Court relied, had not impaired the vitality of the open fields doctrine of *Hester.* Rather, the open fields doctrine was entirely compatible with *Katz'* emphasis on privacy. The court reasoned that the "human relations that create the need for privacy do not ordinarily take place" in open fields, and that the property owner's common-law right to exclude trespassers is insufficiently linked to privacy to warrant the Fourth Amendment's protection. 686 F. 2d, at 360.[3] We granted certiorari. 459 U. S. 1168 (1983).

*No. 82–1273.* After receiving an anonymous tip that marihuana was being grown in the woods behind respondent Thornton's residence, two police officers entered the woods by a path between this residence and a neighboring house. They followed a footpath through the woods until they reached two marihuana patches fenced with chicken wire. Later, the officers determined that the patches were on the property of respondent, obtained a warrant to search the property, and seized the marihuana. On the basis of this evidence, respondent was arrested and indicted.

---

[2] A panel of the Sixth Circuit had affirmed the suppression order. 657 F. 2d 85 (1981).

[3] The four dissenting judges contended that the open fields doctrine did not apply where, as in this case, "reasonable effort[s] [have] been made to exclude the public." 686 F. 2d, at 372. To that extent, the dissent considered that *Katz* v. *United States* implicitly had overruled previous holdings of this Court. The dissent then concluded that petitioner had established a "reasonable expectation of privacy" under the *Katz* standard. Judge Lively also wrote separately to argue that the open fields doctrine applied only to lands that could be viewed by the public.

The trial court granted respondent's motion to suppress the fruits of the second search. The warrant for this search was premised on information that the police had obtained during their previous warrantless search, that the court found to be unreasonable.[4] "No Trespassing" signs and the secluded location of the marihuana patches evinced a reasonable expectation of privacy. Therefore, the court held, the open fields doctrine did not apply.

The Maine Supreme Judicial Court affirmed. 453 A. 2d 489 (1982). It agreed with the trial court that the correct question was whether the search "is a violation of privacy on which the individual justifiably relied," *id.*, at 493, and that the search violated respondent's privacy. The court also agreed that the open fields doctrine did not justify the search. That doctrine applies, according to the court, only when officers are lawfully present on property and observe "open and patent" activity. *Id.*, at 495. In this case, the officers had trespassed upon defendant's property, and the respondent had made every effort to conceal his activity. We granted certiorari. 460 U. S. 1068 (1983).[5]

---

[4] The court also discredited other information, supplied by a confidential informant, upon which the police had based their warrant application.

[5] Respondent contends that the decision below rests upon adequate and independent state-law grounds. We do not read that decision, however, as excluding the evidence because the search violated the State Constitution. The Maine Supreme Judicial Court referred only to the Fourth Amendment of the Federal Constitution and purported to apply the *Katz* test; the prior state cases that the court cited also construed the Federal Constitution. In any case, the Maine Supreme Judicial Court did not articulate an independent state ground with the clarity required by *Michigan* v. *Long*, 463 U. S. 1032 (1983).

Contrary to respondent's assertion, we do not review here the state courts' finding as a matter of "fact" that the area searched was not an "open field." Rather, the question before us is the appropriate legal standard for determining whether search of that area without a warrant was lawful under the Federal Constitution.

The conflict between the two cases that we review here is illustrative of the confusion the open fields doctrine has generated among the state and

## II

The rule announced in *Hester* v. *United States* was founded upon the explicit language of the Fourth Amendment. That Amendment indicates with some precision the places and things encompassed by its protections. As Justice Holmes explained for the Court in his characteristically laconic style: "[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." *Hester* v. *United States*, 265 U. S., at 59.[6]

Nor are the open fields "effects" within the meaning of the Fourth Amendment. In this respect, it is suggestive that James Madison's proposed draft of what became the Fourth

---

federal courts. Compare, *e. g.*, *State* v. *Byers*, 359 So. 2d 84 (La. 1978) (refusing to apply open fields doctrine); *State* v. *Brady*, 406 So. 2d 1093 (Fla. 1981) (same), with *United States* v. *Lace*, 669 F. 2d 46, 50–51 (CA2 1982); *United States* v. *Freie*, 545 F. 2d 1217 (CA9 1976); *United States* v. *Brown*, 473 F. 2d 952, 954 (CA5 1973); *Atwell* v. *United States*, 414 F. 2d 136, 138 (CA5 1969).

[6] The dissent offers no basis for its suggestion that *Hester* rests upon some narrow, unarticulated principle rather than upon the reasoning enunciated by the Court's opinion in that case. Nor have subsequent cases discredited *Hester*'s reasoning. This Court frequently has relied on the explicit language of the Fourth Amendment as delineating the scope of its affirmative protections. See, *e. g.*, *Robbins* v. *California*, 453 U. S. 420, 426 (1981) (opinion of Stewart, J.); *Payton* v. *New York*, 445 U. S. 573, 589–590 (1980); *Alderman* v. *United States*, 394 U. S. 165, 178–180 (1969). As these cases, decided after *Katz*, indicate, *Katz*' "reasonable expectation of privacy" standard did not sever Fourth Amendment doctrine from the Amendment's language. *Katz* itself construed the Amendment's protection of the person against unreasonable searches to encompass electronic eavesdropping of telephone conversations sought to be kept private; and *Katz*' fundamental recognition that "the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures," see 389 U. S., at 353, is faithful to the Amendment's language. As *Katz* demonstrates, the Court fairly may respect the constraints of the Constitution's language without wedding itself to an unreasoning literalism. In contrast, the dissent's approach would ignore the language of the Constitution itself as well as overturn this Court's governing precedent.

Amendment preserves "[t]he rights of the people to be secured in their persons, their houses, their papers, and their other property, from all unreasonable searches and seizures . . . ." See N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 100, n. 77 (1937). Although Congress' revisions of Madison's proposal broadened the scope of the Amendment in some respects, *id.*, at 100–103, the term "effects" is less inclusive than "property" and cannot be said to encompass open fields.[7] We conclude, as did the Court in deciding *Hester* v. *United States*, that the government's intrusion upon the open fields is not one of those "unreasonable searches" proscribed by the text of the Fourth Amendment.

## III

This interpretation of the Fourth Amendment's language is consistent with the understanding of the right to privacy expressed in our Fourth Amendment jurisprudence. Since *Katz* v. *United States*, 389 U. S. 347 (1967), the touchstone of Amendment analysis has been the question whether a person has a "constitutionally protected reasonable expectation of privacy." *Id.*, at 360 (Harlan, J., concurring). The Amendment does not protect the merely subjective expectation of privacy, but only those "expectation[s] that society is prepared to recognize as 'reasonable.'" *Id.*, at 361. See also *Smith* v. *Maryland*, 442 U. S. 735, 740–741 (1979).

## A

No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant. See *Rakas* v. *Illinois*, 439 U. S. 128, 152–153

---

[7] The Framers would have understood the term "effects" to be limited to personal, rather than real, property. See generally *Doe* v. *Dring*, 2 M. & S. 448, 454, 105 Eng. Rep. 447, 449 (K. B. 1814) (discussing prior cases); 2 W. Blackstone, Commentaries *16, *384–*385.

(1978) (POWELL, J., concurring). In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, *e. g.*, *United States* v. *Chadwick*, 433 U. S. 1, 7–8 (1977), the uses to which the individual has put a location, *e. g.*, *Jones* v. *United States*, 362 U. S. 257, 265 (1960), and our societal understanding that certain areas deserve the most scrupulous protection from government invasion, *e. g.*, *Payton* v. *New York*, 445 U. S. 573 (1980). These factors are equally relevant to determining whether the government's intrusion upon open fields without a warrant or probable cause violates reasonable expectations of privacy and is therefore a search proscribed by the Amendment.

In this light, the rule of *Hester* v. *United States, supra*, that we reaffirm today, may be understood as providing that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home. See also *Air Pollution Variance Bd.* v. *Western Alfalfa Corp.*, 416 U. S. 861, 865 (1974). This rule is true to the conception of the right to privacy embodied in the Fourth Amendment. The Amendment reflects the recognition of the Framers that certain enclaves should be free from arbitrary government interference. For example, the Court since the enactment of the Fourth Amendment has stressed "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." *Payton* v. *New York, supra*, at 601.[8] See also *Silverman* v. *United States*, 365 U. S. 505, 511 (1961); *United States* v. *United States District Court*, 407 U. S. 297, 313 (1972).

---

[8] The Fourth Amendment's protection of offices and commercial buildings, in which there may be legitimate expectations of privacy, is also based upon societal expectations that have deep roots in the history of the Amendment. See *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 311 (1978); *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 355 (1977).

In contrast, open fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or "No Trespassing" signs effectively bar the public from viewing open fields in rural areas. And both petitioner Oliver and respondent Thornton concede that the public and police lawfully may survey lands from the air.[9] For these reasons, the asserted expectation of privacy in open fields is not an expectation that "society recognizes as reasonable."[10]

---

[9] Tr. of Oral Arg. 14–15, 58. See, e. g., United States v. Allen, 675 F. 2d 1373, 1380–1381 (CA9 1980); United States v. DeBacker, 493 F. Supp. 1078, 1081 (WD Mich. 1980). In practical terms, petitioner Oliver's and respondent Thornton's analysis merely would require law enforcement officers, in most situations, to use aerial surveillance to gather the information necessary to obtain a warrant or to justify warrantless entry onto the property. It is not easy to see how such a requirement would advance legitimate privacy interests.

[10] The dissent conceives of open fields as bustling with private activity as diverse as lovers' trysts and worship services. Post, at 191–193. But in most instances police will disturb no one when they enter upon open fields. These fields, by their very character as open and unoccupied, are unlikely to provide the setting for activities whose privacy is sought to be protected by the Fourth Amendment. One need think only of the vast expanse of some western ranches or of the undeveloped woods of the Northwest to see the unreality of the dissent's conception. Further, the Fourth Amendment provides ample protection to activities in the open fields that might implicate an individual's privacy. An individual who enters a place defined to be "public" for Fourth Amendment analysis does not lose all claims to privacy or personal security. Cf. Arkansas v. Sanders, 442 U. S. 753, 766–767 (1979) (BURGER, C. J., concurring in judgment). For example, the Fourth Amendment's protections against unreasonable arrest or unreasonable seizure of effects upon the person remain fully applicable. See, e. g., United States v. Watson, 423 U. S. 411 (1976).

The historical underpinnings of the open fields doctrine also demonstrate that the doctrine is consistent with respect for "reasonable expectations of privacy." As Justice Holmes, writing for the Court, observed in *Hester*, 265 U. S., at 59, the common law distinguished "open fields" from the "curtilage," the land immediately surrounding and associated with the home. See 4 W. Blackstone, Commentaries *225. The distinction implies that only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home. At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life," *Boyd* v. *United States*, 116 U. S. 616, 630 (1886), and therefore has been considered part of the home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. See, *e. g.*, *United States* v. *Van Dyke*, 643 F. 2d 992, 993–994 (CA4 1981); *United States* v. *Williams*, 581 F. 2d 451, 453 (CA5 1978); *Care* v. *United States*, 231 F. 2d 22, 25 (CA10), cert. denied, 351 U. S. 932 (1956). Conversely, the common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields.[11]

---

[11] Neither petitioner Oliver nor respondent Thornton has contended that the property searched was within the curtilage. Nor is it necessary in these cases to consider the scope of the curtilage exception to the open fields doctrine or the degree of Fourth Amendment protection afforded the curtilage, as opposed to the home itself. It is clear, however, that the term "open fields" may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither "open" nor a "field" as those terms are used in common speech. For example, contrary to respondent Thornton's suggestion, Tr. of Oral Arg. 21–22, a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment. See, *e. g.*, *United States* v. *Pruitt*, 464 F. 2d 494 (CA9 1972); *Bedell* v. *State*, 257 Ark. 895, 521 S. W. 2d 200 (1975).

We conclude, from the text of the Fourth Amendment and from the historical and contemporary understanding of its purposes, that an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers.

B

Petitioner Oliver and respondent Thornton contend, to the contrary, that the circumstances of a search sometimes may indicate that reasonable expectations of privacy were violated; and that courts therefore should analyze these circumstances on a case-by-case basis. The language of the Fourth Amendment itself answers their contention.

Nor would a case-by-case approach provide a workable accommodation between the needs of law enforcement and the interests protected by the Fourth Amendment. Under this approach, police officers would have to guess before every search whether landowners had erected fences sufficiently high, posted a sufficient number of warning signs, or located contraband in an area sufficiently secluded to establish a right of privacy. The lawfulness of a search would turn on "'[a] highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions . . . .'" *New York* v. *Belton*, 453 U. S. 454, 458 (1981) (quoting LaFave, "Case-By-Case Adjudication" versus "Standardized Procedures": The Robinson Dilemma, 1974 S. Ct. Rev. 127, 142). This Court repeatedly has acknowledged the difficulties created for courts, police, and citizens by an ad hoc, case-by-case definition of Fourth Amendment standards to be applied in differing factual circumstances. See *Belton, supra,* at 458–460; *Robbins* v. *California*, 453 U. S. 420, 430 (1981) (POWELL, J., concurring in judgment); *Dunaway* v. *New York*, 442 U. S. 200, 213–214 (1979); *United States* v. *Robinson*, 414 U. S. 218, 235 (1973). The ad hoc approach not only makes it difficult for the policeman to discern the scope of his authority, *Belton, supra,* at 460; it also creates a danger that consti-

tutional rights will be arbitrarily and inequitably enforced. Cf. *Smith* v. *Goguen*, 415 U. S. 566, 572–573 (1974).[12]

## IV

In any event, while the factors that petitioner Oliver and respondent Thornton urge the courts to consider may be relevant to Fourth Amendment analysis in some contexts, these factors cannot be decisive on the question whether the search of an open field is subject to the Amendment. Initially, we reject the suggestion that steps taken to protect privacy establish that expectations of privacy in an open field are legitimate. It is true, of course, that petitioner Oliver and respondent Thornton, in order to conceal their criminal activities, planted the marihuana upon secluded land and erected fences and "No Trespassing" signs around the property. And it may be that because of such precautions, few members of the public stumbled upon the marihuana crops seized by the police. Neither of these suppositions demonstrates, however, that the expectation of privacy was *legitimate* in the sense required by the Fourth Amendment. The test of legitimacy is not whether the individual chooses to conceal assertedly "private" activity.[13] Rather, the correct inquiry is whether the government's intrusion infringes upon the per-

[12] The clarity of the open fields doctrine that we reaffirm today is not sacrificed, as the dissent suggests, by our recognition that the curtilage remains within the protections of the Fourth Amendment. Most of the many millions of acres that are "open fields" are not close to any structure and so not arguably within the curtilage. And, for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience. The occasional difficulties that courts might have in applying this, like other, legal concepts, do not argue for the unprecedented expansion of the Fourth Amendment advocated by the dissent.

[13] Certainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post "No Trespassing" signs.

sonal and societal values protected by the Fourth Amendment. As we have explained, we find no basis for concluding that a police inspection of open fields accomplishes such an infringement.

Nor is the government's intrusion upon an open field a "search" in the constitutional sense because that intrusion is a trespass at common law. The existence of a property right is but one element in determining whether expectations of privacy are legitimate. " 'The premise that property interests control the right of the Government to search and seize has been discredited.' " *Katz*, 389 U. S., at 353 (quoting *Warden* v. *Hayden*, 387 U. S. 294, 304 (1967)). "[E]ven a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon." *Rakas* v. *Illinois*, 439 U. S., at 144, n. 12.

The common law may guide consideration of what areas are protected by the Fourth Amendment by defining areas whose invasion by others is wrongful. *Id.*, at 153 (POWELL, J., concurring).[14] The law of trespass, however, forbids intrusions upon land that the Fourth Amendment would not proscribe. For trespass law extends to instances where the exercise of the right to exclude vindicates no legitimate privacy interest.[15] Thus, in the case of open fields, the general

---

[14] As noted above, the common-law conception of the "curtilage" has served this function.

[15] The law of trespass recognizes the interest in possession and control of one's property and for that reason permits exclusion of unwanted intruders. But it does not follow that the right to exclude conferred by trespass law embodies a privacy interest also protected by the Fourth Amendment. To the contrary, the common law of trespass furthers a range of interests that have nothing to do with privacy and that would not be served by applying the strictures of trespass law to public officers. Criminal laws against trespass are prophylactic: they protect against intruders who poach, steal livestock and crops, or vandalize property. And the civil action of trespass serves the important function of authorizing an owner to defeat claims of prescription by asserting his own title. See, *e. g.*,

rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment.

## V

We conclude that the open fields doctrine, as enunciated in *Hester,* is consistent with the plain language of the Fourth Amendment and its historical purposes. Moreover, Justice Holmes' interpretation of the Amendment in *Hester* accords with the "reasonable expectation of privacy" analysis developed in subsequent decisions of this Court. We therefore affirm *Oliver* v. *United States; Maine* v. *Thornton* is reversed and remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, concurring in part and concurring in the judgment.

I concur in the judgment and join Parts I and II of the Court's opinion. These Parts dispose of the issue before us; there is no need to go further and deal with the expectation of privacy matter. However reasonable a landowner's expectations of privacy may be, those expectations cannot convert a field into a "house" or an "effect."

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

In each of these consolidated cases, police officers, ignoring clearly visible "No Trespassing" signs, entered upon private land in search of evidence of a crime. At a spot that could

---

O. Holmes, The Common Law 98–100, 244–246 (1881). In any event, unlicensed use of property by others is presumptively unjustified, as anyone who wishes to use the property is free to bargain for the right to do so with the property owner, cf. R. Posner, Economic Analysis of Law 10–13, 21 (1973). For these reasons, the law of trespass confers protections from intrusion by others far broader than those required by Fourth Amendment interests.

not be seen from any vantage point accessible to the public, the police discovered contraband, which was subsequently used to incriminate the owner of the land. In neither case did the police have a warrant authorizing their activities.

The Court holds that police conduct of this sort does not constitute an "unreasonable search" within the meaning of the Fourth Amendment. The Court reaches that startling conclusion by two independent analytical routes. First, the Court argues that, because the Fourth Amendment by its terms renders people secure in their "persons, houses, papers, and effects," it is inapplicable to trespasses upon land not lying within the curtilage of a dwelling. *Ante*, at 176–177. Second, the Court contends that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Ante*, at 178. Because I cannot agree with either of these propositions, I dissent.

## I

The first ground on which the Court rests its decision is that the Fourth Amendment "indicates with some precision the places and things encompassed by its protections," and that real property is not included in the list of protected spaces and possessions. *Ante*, at 176. This line of argument has several flaws. Most obviously, it is inconsistent with the results of many of our previous decisions, none of which the Court purports to overrule. For example, neither a public telephone booth nor a conversation conducted therein can fairly be described as a person, house, paper, or effect;[1] yet we have held that the Fourth Amendment forbids the police without a warrant to eavesdrop on such a conversation. *Katz* v. *United States*, 389 U. S. 347 (1967). Nor can it plau-

---

[1] The Court informs us that the Framers would have understood the term "effects" to encompass only personal property. *Ante*, at 177, n. 7. Such a construction of the term would exclude both a public phone booth and spoken words.

sibly be argued that an office or commercial establishment is covered by the plain language of the Amendment; yet we have held that such premises are entitled to constitutional protection if they are marked in a fashion that alerts the public to the fact that they are private. *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 311 (1978); *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 358–359 (1977).[2]

Indeed, the Court's reading of the plain language of the Fourth Amendment is incapable of explaining even its own holding in this case. The Court rules that the curtilage, a zone of real property surrounding a dwelling, is entitled to constitutional protection. *Ante*, at 180. We are not told, however, whether the curtilage is a "house" or an "effect"— or why, if the curtilage can be incorporated into the list of things and spaces shielded by the Amendment, a field cannot.

The Court's inability to reconcile its parsimonious reading of the phrase "persons, houses, papers, and effects" with our prior decisions or even its own holding is a symptom of a more fundamental infirmity in the Court's reasoning. The Fourth Amendment, like the other central provisions of the Bill of Rights that loom large in our modern jurisprudence, was designed, not to prescribe with "precision" permissible and impermissible activities, but to identify a fundamental human liberty that should be shielded forever from government intrusion.[3] We do not construe constitutional pro-

---

[2] On the other hand, an automobile surely does constitute an "effect." Under the Court's theory, cars should therefore stand on the same constitutional footing as houses. Our cases establish, however, that car owners' diminished expectations that their cars will remain free from prying eyes warrants a corresponding reduction in the constitutional protection accorded cars. *E. g., United States* v. *Martinez-Fuerte*, 428 U. S. 543, 561 (1976).

[3] By their terms, the provisions of the Bill of Rights curtail only activities by the Federal Government, see *Barron* v. *Mayor and City Council of Baltimore*, 7 Pet. 243 (1833), but the Fourteenth Amendment subjects state and local governments to the most important of those restrictions, see, *e. g., Cantwell* v. *Connecticut*, 310 U. S. 296 (1940) (First Amendment); *Wolf* v. *Colorado*, 338 U. S. 25 (1949) (Fourth Amendment).

visions of this sort the way we do statutes, whose drafters can be expected to indicate with some comprehensiveness and exactitude the conduct they wish to forbid or control and to change those prescriptions when they become obsolete.[4] Rather, we strive, when interpreting these seminal constitutional provisions, to effectuate their purposes—to lend them meanings that ensure that the liberties the Framers sought to protect are not undermined by the changing activities of government officials.[5]

The liberty shielded by the Fourth Amendment, as we have often acknowledged, is freedom "from unreasonable government intrusions into . . . legitimate expectations of privacy." *United States* v. *Chadwick*, 433 U. S. 1, 7 (1977). That freedom would be incompletely protected if only government conduct that impinged upon a person, house, paper, or effect were subject to constitutional scrutiny. Accordingly, we have repudiated the proposition that the Fourth Amendment applies only to a limited set of locales or kinds of property. In *Katz* v. *United States*, we expressly rejected a proffered locational theory of the coverage of the Amendment, holding that it "protects people, not places." 389 U. S., at 351. Since that time we have consistently adhered

---

[4] Cf. *McCulloch* v. *Maryland*, 4 Wheat. 316, 407 (1819) ("[W]e must never forget, that it is *a constitution* we are expounding." Such a document cannot be as detailed as a "legal code"; "[i]ts nature . . . requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves") (emphasis in original).

[5] Our rejection of the mode of interpretation appropriate for statutes is perhaps clearest in our treatment of the First Amendment. That Amendment provides, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech, or of the press" but says nothing, for example, about restrictions on expressive behavior or about access to the courts. Yet, to give effect to the purpose of the Amendment, we have applied it to regulations of conduct designed to convey a message, *e. g.*, *Edwards* v. *South Carolina*, 372 U. S. 229 (1963), and have accorded constitutional protection to the public's "right of access to criminal trials," *Globe Newspaper Co.* v. *Superior Court*, 457 U. S. 596, 604–605 (1982).

to the view that the applicability of the provision depends solely upon "whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith* v. *Maryland*, 442 U. S. 735, 740 (1979).[6] The Court's contention that, because a field is not a house or effect, it is not covered by the Fourth Amendment is inconsistent with this line of cases and with the understanding of the nature of constitutional adjudication from which it derives.[7]

## II

The second ground for the Court's decision is its contention that any interest a landowner might have in the privacy of his woods and fields is not one that "society is prepared to recognize as 'reasonable.'" *Ante*, at 177 (quoting *Katz* v. *United States*, 389 U. S., at 361 (Harlan, J., concurring)).

---

[6] See also *United States* v. *Chadwick*, 433 U. S. 1, 7, 11 (1977) (disagreeing with the suggestion that the Fourth Amendment "protects only dwellings and other specifically designated locales"; asserting instead that the purpose of the Amendment "is to safeguard individuals from unreasonable government invasions of legitimate privacy interests"); *Rakas* v. *Illinois*, 439 U. S. 128, 143 (1978) (holding that the determinative question is "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place").

Our most recent decisions continue to rely on the conception of the purpose and scope of the Fourth Amendment that we enunciated in *Katz*. See, *e. g.*, *United States* v. *Jacobsen*, *ante*, at 113–118; *Michigan* v. *Clifford*, 464 U. S. 287, 292–293 (1984); *Illinois* v. *Andreas*, 463 U. S. 765, 771 (1983); *United States* v. *Place*, 462 U. S. 696, 706–707 (1983); *Texas* v. *Brown*, 460 U. S. 730, 738–740 (1983) (plurality opinion); *United States* v. *Knotts*, 460 U. S. 276, 280–281 (1983).

[7] Sensitive to the weakness of its argument that the "persons or things" mentioned in the Fourth Amendment exhaust the coverage of the provision, the Court goes on to analyze at length the privacy interests that might legitimately be asserted in "open fields." The inclusion of Parts III and IV in the opinion, coupled with the Court's reaffirmation of *Katz* and its progeny, *ante*, at 177, strongly suggests that the plain-language theory sketched in Part II of the Court's opinion will have little or no effect on our future decisions in this area.

The mode of analysis that underlies this assertion is certainly more consistent with our prior decisions than that discussed above. But the Court's conclusion cannot withstand scrutiny.

As the Court acknowledges, we have traditionally looked to a variety of factors in determining whether an expectation of privacy asserted in a physical space is "reasonable." *Ante*, at 177–178. Though those factors do not lend themselves to precise taxonomy, they may be roughly grouped into three categories. First, we consider whether the expectation at issue is rooted in entitlements defined by positive law. Second, we consider the nature of the uses to which spaces of the sort in question can be put. Third, we consider whether the person claiming a privacy interest manifested that interest to the public in a way that most people would understand and respect.[8] When the expectations of privacy asserted by petitioner Oliver and respondent Thornton[9] are examined through these lenses, it becomes clear that those expectations are entitled to constitutional protection.

## A

We have frequently acknowledged that privacy interests are not coterminous with property rights. *E. g.*, *United States* v. *Salvucci*, 448 U. S. 83, 91 (1980). However, because "property rights reflect society's explicit recognition

---

[8] The privacy interests protected by the Fourth Amendment are not limited to expectations that physical areas will remain free from public and government intrusion. See *supra*, at 187–188. The factors relevant to the assessment of the reasonableness of a nonspatial privacy interest may well be different from the three considerations discussed here. See, *e. g.*, *Smith* v. *Maryland*, 442 U. S. 735, 747–748 (1979) (Stewart, J., dissenting); *id.*, at 750–752 (MARSHALL, J., dissenting).

[9] The Court does not dispute that Oliver and Thornton had subjective expectations of privacy, nor could it in view of the lower courts' findings on that issue. See *United States* v. *Oliver*, No. CR80–00005–01–BG (WD Ky., Nov. 14, 1980), App. to Pet. for Cert. in No. 82–15, pp. 19–20; *Maine* v. *Thornton*, No. CR82–10 (Me. Super. Ct., Apr. 16, 1982), App. to Pet. for Cert. in No. 82–1273, pp. B–4—B–5.

of a person's authority to act as he wishes in certain areas, [they] should be considered in determining whether an individual's expectations of privacy are reasonable." *Rakas* v. *Illinois*, 439 U. S. 128, 153 (1978) (POWELL, J., concurring).[10] Indeed, the Court has suggested that, insofar as "[o]ne of the main rights attaching to property is the right to exclude others, . . . one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." *Id.*, at 144, n. 12 (opinion of the Court).[11]

It is undisputed that Oliver and Thornton each owned the land into which the police intruded. That fact alone provides considerable support for their assertion of legitimate privacy interests in their woods and fields. But even more telling is the nature of the sanctions that Oliver and Thornton could invoke, under local law, for violation of their property rights. In Kentucky, a knowing entry upon fenced or otherwise enclosed land, or upon unenclosed land conspicuously posted with signs excluding the public, constitutes criminal trespass. Ky. Rev. Stat. §§ 511.070(1), 511.080, 511.090(4) (1975). The law in Maine is similar. An intrusion into "any place from

---

[10] The Court today seeks to evade the force of this principle by contending that the law of property is designed to serve various "prophylactic" and "economic" purposes unrelated to the protection of privacy. *Ante*, at 183–184, and n. 15. Such efforts to rationalize the distribution of entitlements under state law are interesting and may have some explanatory power, but cannot support the weight the Court seeks to place upon them. The Court surely must concede that *one* of the purposes of the law of real property (and specifically the law of criminal trespass, see *infra*, this page and 191, and n. 12) is to define and enforce privacy interests—to empower some people to make whatever use they wish of certain tracts of land without fear that other people will intrude upon their activities. The views of commentators, old and new, as to other functions served by positive law are thus insufficient to support the Court's sweeping assertion that "in the case of open fields, the general rights of property . . . have little or no relevance to the applicability of the Fourth Amendment," *ante*, at 183–184.

[11] See also *Rawlings* v. *Kentucky*, 448 U. S. 98, 112 (1980) (BLACKMUN, J., concurring).

which [the intruder] may lawfully be excluded and which is posted in a manner prescribed by law or in a manner reasonably likely to come to the attention of intruders or which is fenced or otherwise enclosed" is a crime. Me. Rev. Stat. Ann., Tit. 17A, § 402(1)(C) (1964).[12] Thus, positive law not only recognizes the legitimacy of Oliver's and Thornton's insistence that strangers keep off their land, but subjects those who refuse to respect their wishes to the most severe of penalties—criminal liability. Under these circumstances, it is hard to credit the Court's assertion that Oliver's and Thornton's expectations of privacy were not of a sort that society is prepared to recognize as reasonable.

## B

The uses to which a place is put are highly relevant to the assessment of a privacy interest asserted therein. *Rakas* v. *Illinois, supra,* at 153 (POWELL, J., concurring). If, in light of our shared sensibilities, those activities are of a kind in which people should be able to engage without fear of intrusion by private persons or government officials, we extend the protection of the Fourth Amendment to the space in question, even in the absence of any entitlement derived from positive law. *E. g., Katz* v. *United States*, 389 U. S., at 352–353.[13]

---

[12] Cf. Comment to ALI, Model Penal Code § 221.2, p. 87 (1980) ("The common thread running through these provisions [a sample of state criminal trespass laws] is the element of unwanted intrusion, usually coupled with some sort of notice to would-be intruders that they may not enter. Most people do not object to strangers tramping through woodland or over pasture or open range. On the other hand, intrusions into buildings, onto property fenced in a manner manifestly designed to exclude intruders, or onto any private property in defiance of actual notice to keep away is generally considered objectionable and under some circumstances frightening").

[13] In most circumstances, this inquiry requires analysis of the sorts of uses to which a given space is susceptible, not the manner in which the person asserting an expectation of privacy in the space was in fact employing

Privately owned woods and fields that are not exposed to public view regularly are employed in a variety of ways that society acknowledges deserve privacy. Many landowners like to take solitary walks on their property, confident that they will not be confronted in their rambles by strangers or policemen. Others conduct agricultural businesses on their property.[14] Some landowners use their secluded spaces to meet lovers, others to gather together with fellow worshippers, still others to engage in sustained creative endeavor. Private land is sometimes used as a refuge for wildlife, where flora and fauna are protected from human intervention of any kind.[15] Our respect for the freedom of landowners to use

it. See, *e. g.*, *United States* v. *Chadwick*, 433 U. S., at 13. We make exceptions to this principle and evaluate uses on a case-by-case basis in only two contexts: when called upon to assess (what formerly was called) the "standing" of a particular person to challenge an intrusion by government officials into a area over which that person lacked primary control, see, *e. g.*, *Rakas* v. *Illinois*, 439 U. S., at 148–149; *Jones* v. *United States*, 362 U. S. 257, 265–266 (1960), and when it is possible to ascertain how a person is using a particular space without violating the very privacy interest he is asserting, see, *e. g.*, *Katz* v. *United States*, 389 U. S., at 352. (In cases of the latter sort, the inquiries described in this Part and in Part II–C, *infra*, are coextensive). Neither of these exceptions is applicable here. Thus, the majority's contention that, because the cultivation of marihuana is not an activity that society wishes to protect, Oliver and Thornton had no legitimate privacy interest in their fields, *ante*, at 182–183, and n. 13, reflects a misunderstanding of the level of generality on which the constitutional analysis must proceed.

[14] We accord constitutional protection to businesses conducted in office buildings, see *supra*, at 185–186; it is not apparent why businesses conducted in fields that are not open to the public are less deserving of the benefit of the Fourth Amendment.

[15] This last-mentioned use implicates a kind of privacy interest somewhat different from those to which we are accustomed. It involves neither a person's interest in immunity from observation nor a person's interest in shielding from scrutiny the residues and manifestations of his personal life. Cf. Weinreb, Generalities of the Fourth Amendment, 42 U. Chi. L. Rev. 47, 52–54 (1974). It derives, rather, from a person's desire to preserve inviolate a portion of his world. The idiosyncracy of this interest does not, however, render it less deserving of constitutional protection.

their posted "open fields" in ways such as these partially explains the seriousness with which the positive law regards deliberate invasions of such spaces, see *supra*, at 190–191, and substantially reinforces the landowners' contention that their expectations of privacy are "reasonable."

## C

Whether a person "took normal precautions to maintain his privacy" in a given space affects whether his interest is one protected by the Fourth Amendment. *Rawlings* v. *Kentucky*, 448 U. S. 98, 105 (1980).[16] The reason why such precautions are relevant is that we do not insist that a person who has a right to exclude others exercise that right. A claim to privacy is therefore strengthened by the fact that the claimant somehow manifested to other people his desire that they keep their distance.

Certain spaces are so presumptively private that signals of this sort are unnecessary; a homeowner need not post a "Do Not Enter" sign on his door in order to deny entrance to uninvited guests.[17] Privacy interests in other spaces are more ambiguous, and the taking of precautions is consequently more important; placing a lock on one's footlocker strengthens one's claim that an examination of its contents is impermissible. See *United States* v. *Chadwick*, 433 U. S., at 11. Still other spaces are, by positive law and social convention, presumed accessible to members of the public *unless* the owner manifests his intention to exclude them.

Undeveloped land falls into the last-mentioned category. If a person has not marked the boundaries of his fields or woods in a way that informs passersby that they are not wel-

---

[16] See also *Rakas* v. *Illinois*, *supra*, at 152 (POWELL, J., concurring); *United States* v. *Chadwick*, *supra*, at 11; *Katz* v. *United States*, *supra*, at 352.

[17] However, if the homeowner acts affirmatively to invite someone into his abode, he cannot later insist that his privacy interests have been violated. *Lewis* v. *United States*, 385 U. S. 206 (1966).

come, he cannot object if members of the public enter onto the property. There is no reason why he should have any greater rights as against government officials. Accordingly, we have held that an official may, without a warrant, enter private land from which the public is not excluded and make observations from that vantage point. *Air Pollution Variance Board* v. *Western Alfalfa Corp.*, 416 U. S. 861, 865 (1974). Fairly read, the case on which the majority so heavily relies, *Hester* v. *United States*, 265 U. S. 57 (1924), affirms little more than the foregoing unremarkable proposition. From aught that appears in the opinion in that case, the defendants, fleeing from revenue agents who had observed them committing a crime, abandoned incriminating evidence on private land from which the public had not been excluded. Under such circumstances, it is not surprising that the Court was unpersuaded by the defendants' argument that the entry onto their fields by the agents violated the Fourth Amendment.[18]

A very different case is presented when the owner of undeveloped land has taken precautions to exclude the public. As indicated above, a deliberate entry by a private citizen onto private property marked with "No Trespassing" signs will expose him to criminal liability. I see no reason why a government official should not be obliged to respect such

---

[18] An argument supportive of the position taken by the Court today might be constructed on the basis of an examination of the record in *Hester*. It appears that, in his approach to the house, one of the agents crossed a pasture fence. See Tr. of Record in *Hester* v. *United States*, O. T. 1923, No. 243, p. 16. However, the Court, in its opinion, placed no weight upon—indeed, did not even mention—that circumstance.

In any event, to the extent that *Hester* may be read to support a rule any broader than that stated in *Air Pollution Variance Board* v. *Western Alfalfa Corp.*, 416 U. S. 861 (1974), it is undercut by our decision in *Katz*, which repudiated the locational theory of the coverage of the Fourth Amendment enunciated in *Olmstead* v. *United States*, 277 U. S. 438 (1928), and by the line of decisions originating in *Katz*, see *supra*, at 187–188, and n. 6.

unequivocal and universally understood manifestations of a landowner's desire for privacy.[19]

In sum, examination of the three principal criteria we have traditionally used for assessing the reasonableness of a person's expectation that a given space would remain private indicates that interests of the sort asserted by Oliver and Thornton are entitled to constitutional protection. An owner's right to insist that others stay off his posted land is firmly grounded in positive law. Many of the uses to which such land may be put deserve privacy. And, by marking the boundaries of the land with warnings that the public should not intrude, the owner has dispelled any ambiguity as to his desires.

The police in these cases proffered no justification for their invasions of Oliver's and Thornton's privacy interests; in neither case was the entry legitimated by a warrant or by one of the established exceptions to the warrant requirement. I conclude, therefore, that the searches of their land violated the Fourth Amendment, and the evidence obtained in the course of those searches should have been suppressed.

## III

A clear, easily administrable rule emerges from the analysis set forth above: Private land marked in a fashion sufficient to render entry thereon a criminal trespass under the law of the State in which the land lies is protected by the Fourth Amendment's proscription of unreasonable searches and seizures. One of the advantages of the foregoing rule is that

---

[19] Indeed, important practical considerations suggest that the police should not be empowered to invade land closed to the public. In many parts of the country, landowners feel entitled to use self-help in expelling trespassers from their posted property. There is thus a serious risk that police officers, making unannounced, warrantless searches of "open fields," will become involved in violent confrontations with irate landowners, with potentially tragic results. Cf. *McDonald* v. *United States*, 335 U. S. 451, 460–461 (1948) (Jackson, J., concurring).

it draws upon a doctrine already familiar to both citizens and government officials. In each jurisdiction, a substantial body of statutory and case law defines the precautions a landowner must take in order to avail himself of the sanctions of the criminal law. The police know that body of law, because they are entrusted with responsibility for enforcing it against the public; it therefore would not be difficult for the police to abide by it themselves.

By contrast, the doctrine announced by the Court today is incapable of determinate application. Police officers, making warrantless entries upon private land, will be obliged in the future to make on-the-spot judgments as to how far the curtilage extends, and to stay outside that zone.[20] In addition, we may expect to see a spate of litigation over the question of how much improvement is necessary to remove private land from the category of "unoccupied or undeveloped area" to which the "open fields exception" is now deemed applicable. See *ante*, at 180, n. 11.

The Court's holding not only ill serves the need to make constitutional doctrine "workable for application by rank-and-file, trained police officers," *Illinois* v. *Andreas*, 463 U. S. 765, 772 (1983), it withdraws the shield of the Fourth Amendment from privacy interests that clearly deserve protection. By exempting from the coverage of the Amendment large areas of private land, the Court opens the way to investigative activities we would all find repugnant. Cf., *e. g.*, *United States* v. *Lace*, 669 F. 2d 46, 54 (CA2 1982) (Newman, J., concurring in result) ("[W]hen police officers execute military maneuvers on residential property for three weeks of round-the-clock surveillance, can that be called 'rea-

---

[20] The likelihood that the police will err in making such judgments is suggested by the difficulty experienced by courts when trying to define the curtilage of dwellings. See, *e. g.*, *United States* v. *Berrong*, 712 F. 2d 1370, 1374, and n. 7 (CA11 1983), cert. pending, No. 83–988; *United States* v. *Van Dyke*, 643 F. 2d 992, 993–994 (CA4 1981).

sonable'?"); *State* v. *Brady,* 406 So. 2d 1093, 1094–1095 (Fla. 1981) ("In order to position surveillance groups around the ranch's airfield, deputies were forced to cross a dike, ram through one gate and cut the chain lock on another, cut or cross posted fences, and proceed several hundred yards to their hiding places"), cert. granted, 456 U. S. 988, supplemental memoranda ordered and oral argument postponed, 459 U. S. 986 (1982).[21]

The Fourth Amendment, properly construed, embodies and gives effect to our collective sense of the degree to which men and women, in civilized society, are entitled "to be let alone" by their governments. *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting); cf. *Smith* v. *Maryland,* 442 U. S., at 750 (MARSHALL, J., dissenting). The Court's opinion bespeaks and will help to promote an impoverished vision of that fundamental right.

I dissent.

---

[21] Perhaps the most serious danger in the decision today is that, if the police are permitted routinely to engage in such behavior, it will gradually become less offensive to us all. As Justice Brandeis once observed: "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law . . . ." *Olmstead* v. *United States,* 277 U. S., at 485 (dissenting opinion). See also *Solem* v. *Stumes,* 465 U. S. 638, 667 (1984) (STEVENS, J., dissenting).