**UNITED STATES of America, Plaintiff,**

v.

**Michael Watson CANNON, Defendant.**

**No. CR. S–99–17–LKK.**

United States District Court, E.D. California, Eastern Division.

June 12, 2000.

Robert M. Twiss, Asst. U.S. Atty., Sacramento, CA, for Plaintiff.

Ron Peters, Sacramento, CA, for Defendant.

### *ORDER*

KARLTON, District Judge.

### I.

### FACTS

DEA Special Agent Michael Collette drafted an affidavit and a search warrant seeking authorization to search 1250 Hemlock Street in the city of Chico, California, after obtaining incriminating evidence from a cooperating witness concerning the

owner of the property. In Attachment A to the warrant the place to be searched is "further described as a double story, single family dwelling, sand wooden structure with brown trim and dark gray composite style roof; further identified by the three inch black numbers '1250' affixed to the house, facing Hemlock Street." [1]

The search warrant authorized the seizure of property to be found in Attachment B of the search warrant which included, *inter alia:*

"7. Articles of personal property, such as ... vehicles, structures, storage areas, residences or containers where marijuana or evidence may be found." [2]

At the time of the application for the search warrant, SA Collette knew that there were two structures within the fence that surrounded 1250 Hemlock Street, but failed to so inform the magistrate judge.[3] At the time he prepared the warrant and affidavit, Collette reasonably assumed that the second structure was a garage. In any event, Collette failed to specify the accessory building as a place to be searched.

The accessory building, while physically connected to the main residence by a wooden deck, had been converted into a supplemental residence in approximately 1982. Apparently, in days gone by, it was a common practice in Chico to convert garages into college student type residences without obtaining the proper building permits. Such was the history of the instant outbuilding.[4]

---

1. So begins the odyssey of confusion and ambiguity disclosed by this motion to suppress. What could a "sand wooden structure" have possibly meant to the magistrate judge when he signed the search warrant? One wants to believe that it was a careless reading and the word "color" following "sand" was misapprehended as being in the phrase; one fears that the magistrate judge never read attachment "A."

In any event the purpose of submitting the affidavit and warrant to the magistrate judge was ill served, *see also* n. 2. As the Supreme Court explained long ago, the practice seeks to insure "the informed and deliberate determinations of magistrates" *United States v. Lefkowitz,* 285 U.S. 452, 464, 52 S.Ct. 420, 76 L.Ed. 877 (1932).

2. Once again one wonders what the magistrate judge could possibly have understood was meant by the phrase "articles of personal property, such as ... structures, storage areas, [or] residences ... where marijuana or evidence may be found."

The Government's concession that the affidavit and warrant were less than models of clarity is, to say the least, a concession of the obvious.

3. The court will call the two structures the "main house" and the "accessory building."

4. Indeed, it appears the City knew of the conversion for some twenty years. *See* Cannon Suppl. Decl.

Attached to the accessory building were two storage sheds. Each shed may only be accessed from the exterior of the accessory building.

On January 13, 1999, DEA agents executed the search warrant. In addition to the main house the officers entered the accessory building where they discovered evidence that it was being used as a residence. They found no incriminating evidence in the accessory building itself. The storage sheds, however were a different story.

When the executing officers arrived, both storage sheds were locked. The keys to the locks to the two storage sheds were found on key rings in the pants pocket of defendant Cannon, the owner of the property. Upon retrieving the keys and opening the storage sheds, the executing officers found and seized several hundred growing marijuana plants.

The question that is tendered is whether the warrant authorized the search, and, if not, what, if any, consequences flow from the unauthorized seizure.

## II.

### WARRANTS AND SEIZURES

The Constitution provides protection against unreasonable searches and seizures and provides that no warrant shall issue unless "particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., Amend. IV. Despite the particularity language of the Constitution, suggesting close construction of the language of a warrant authorizing a search, the Supreme Court has explained that "affidavits for search warrants ... must be tested and interpret-

ed by magistrates and courts in a common-sense and realistic fashion," *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), warning that "[a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." *Id.*[5] With this admonition in mind, I turn to resolution of the motion at bar.

The initial question is whether the warrant, which neither describes the existence of the accessory building, nor in terms authorizes the search of the storage sheds, may nonetheless justify their search and the seizure of their contents. Strange as it might seem, asking the question does not answer it.

■ A second plain meaning reading of the warrant also suggests an unwarranted search. Because the warrant as written is incoherent, it would not be unreasonable to conclude that it could not authorize any search.[6] Although tempting, such a "common sense" solution will not do.[7]

While the words "sand wooden structure" do not make sense, nor does describing "structures, storage areas [and] residences" as property to be seized, when read with great sympathy, the search warrant may be read as at least authorizing the search of a "double story, single family dwelling, ... with brown trim and dark gray composite style roof; further identified by the three inch black numbers '1250' affixed to the house, facing Hemlock Street." Because the description of the placed to be searched, eliding the meaningless phrase, is quite specific, it appears

---

**5.** The Supreme Court's observation at first blush makes little sense. If an officer's conduct does not comport with the requisites of the Constitution suppression should follow, and nothing would be gained by the conduct. Of course, this court is bound by the Supreme Court's holding whether the rationale makes sense or not. *See Hutto v. Davis*, 454 U.S. 370, 375, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982)(lower courts bound by supreme court "no matter how misguided.")

**6.** While, as I note in the text, the Supreme Court has urged on the lower courts a common sense reading of warrants, the second element of the standard is "sense." A common sense reading is precluded when the document is incoherent.

**7.** As I have sometimes observed from the bench, "common sense" is what teaches that the world is flat.

to this court that there was sufficient identification of the place to be searched to satisfy the particularity requirement of the fundamental law. Because there is a particular description, however, and because the place searched does not fall within its literal terms, once again it would seem to follow that the search was not authorized by the warrant. Once again that result does not automatically follow.

■ The Government contends that this case is akin to those searches involving multiple occupancy structures. *See* 2 LaFave *Search and Seizure,* § 4.5b (3d ed. 1998 Supp.). According to that most authoritative Fourth Amendment text, the leading case in this area is *United States v. Santore,* 290 F.2d 51 (2d Cir.1959). *See* 2 LaFave *Search and Seizure,* § 4.5(b). As LaFave has explained, resolution of such cases turns upon whether from its outward appearance the structure would be taken to be a single-occupancy dwelling.

The matter at bar is readily distinguishable from such cases. Here, unlike the *Santore* type cases, the accessory building is quite distinct from the main dwelling, being neither two story nor having a dark gray composite style roof, nor having the numbers '1250' attached to it. Under such circumstances, the court must conclude that the warrant did not authorize the search under a *Santore* analysis. *See Maryland v. Garrison,* 480 U.S. 79, 85, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) ("Plainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant.") [8]

■ The Government also argues that the matter at bar is akin to so-called at-tached garage cases, *see, e.g., United States v. Frazin,* 780 F.2d 1461, 1467 (9th Cir.1986); *United States v. Gorman,* 104 F.3d 272, 274 (9th Cir.1996). I cannot agree.

Attached garage cases ultimately can be rationalized on the basis that there is but a single structure and authorization to search the structure suffices to authorize it subunits. Thus, where there is authorization to search an entire home with an attached garage, there is no more need to specify the garage than the kitchen. *Frazin,* 780 F.2d at 1467. Here, however, although the accessory building was connected to the main house by a wooden deck, it was clearly a distinct structure. Moreover, the officers could not have believed it was a garage, since there was no garage door.[9] As the Ninth Circuit has explained, whether an outbuilding is within the scope of the warrant depends on such matters as whether the object of the search is located in a rural or suburban setting, and common sense indicia of the nature of the relationship of the outbuilding to the specified structure. *See United States v. Williams,* 687 F.2d 290, 293 (9th Cir.1982). Here, the suburban setting, the detached and distinct character of the accessory building, the absence of indicia of it being a garage or having any functional relationship to the main building, all lead to the conclusion that the warrant did not extend to the accessory building.

Finally, the Government argues that the search was justified because it occurred within the curtilage of the main house, which this court has concluded was subject to search. The argument does not lie.

■ While it is true that the courts have found the issuance of a warrant to search a residence implies a right to

---

8. Indeed, it is at least arguable that since the accessory building and the sheds attached to it are not referred to in the affidavit, authorization to search them would render the warrant overbroad in that respect.

9. At the hearing, the court indicated that the searching officers could have had a good faith

belief that the warrant covered the accessory building, at least until they entered it and observed that it was a residence. Upon review of the transcript, however, for the reasons noted above, I conclude that the facts precluded a belief that the accessory building was covered by the warrant.

search the curtilage, *see United States v. Gorman*, 104 F.3d 272 (9th Cir.1996), those cases have no application to the matter at bar.[10] As the Ninth Circuit has explained, "[t]he curtilage is simply an extension of the residence's living area." *Gorman*, 104 F.3d at 274. As the Supreme Court explained, the curtilage has been considered a part of the home for Fourth Amendment purposes. *Id.* (quoting *Oliver v. United States*, 466 U.S. at 180, 104 S.Ct. 1735). Here, because the storage sheds were attached to a residence separate and distinct from the main house, it simply was not within the curtilage of the structure which the warrant authorized to be searched. In fact, of course, the sheds were part of the accessory building; but from a curtilage viewpoint they can only be viewed as being within its curtilage and not that of the main house.

■ The above conclusions, however, still do not resolve the motion. The evidence sought to be searched was not found in the accessory building, but in the storage sheds attached, but exterior, to that structure. Those sheds were locked and the keys to them were found with the suspect owner of the main structure which, as I concluded above, was subject to search under the warrant.

The issue now becomes whether the fact that the defendant possessed the keys justifies the search of the sheds. In *Garrison* the Court noted that, as here, there was probable cause to search the area specified by the warrant. Moreover, the fact that the defendant there possessed the keys made the officers failure to perceive the over breadth of the warrant reasonable. Here, the case appears quite different. Even if at the time the warrant issued, SA Collette reasonably believed that the accessory building was a garage, once the officers executed the warrant and observed that it was not a garage, and especially after they entered the building and should have understood the it was a sepa-

rate residence, a failure to perceive that the warrant, if read to include the accessory building, was overbroad, was not reasonable. *See Garrison*, 480 U.S. at 79, 107 S.Ct. 1013 ("If the officers had known or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit the search to McNabb's apartment.")

Nor does the fact that the warrant authorized the seizure of storage sheds justify the search. First, as I explained above, to avoid the problems tendered by the warrant's incoherence, the court is compelled to read it as being limited to the main house. Thus, assuming the authorization to seize storage sheds could somehow be transmuted into authority to search them, it could only authorize a search of storage sheds associated with the main house. Clearly, here, however, the sheds were not associated with the area subject to search but with a separate dwelling. To suggest that the fact that Cannon had the keys automatically authorized the search, is to do away the particularity requirement entirely. Surely the Government would not contend that Cannon's possession of the keys to an apartment on the other side of town would justify its search. *See Garrison*, 480 U.S. at 88 n. 3, 107 S.Ct. 1013 ("The police could reasonably believe that McWebb was admitting them to an undivided apartment.") In sum, I conclude that under the circumstances and even given a generous reading to the warrant, the search and subsequent seizure of the contents of the sheds was not authorized by it. Nonetheless, resolution of the motion has not yet been reached for the Government maintains that the good faith of the officers forgives their intrusion into areas not governed by the warrant.

---

10. It is not without irony that a notion designed to insure a zone of privacy, *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735,

80 L.Ed.2d 214 (1984), has been employed to expand the area authorized to be searched under a warrant.

## III.

### GOOD FAITH

■ Although the Fourth Amendment itself contains no language compelling the exclusion of evidence, it seems to this court an inevitable consequence of our constitutional system. It is selfevident that a seizure in violation of the Fourth Amendment is unreasonable. Thus, the fruits of an unreasonable seizure, being obtained in violation of the fundamental law, should be inadmissable in a court governed by that law. Two constitutional considerations appear to this court to compel that result. First, the Constitution not only guarantees specific rights but also due process. Surely, at minimum, the process due a defendant is a trial governed by the strictures of the substantive provisions of the Bill of Rights. Thus, a violation of the rights guaranteed by the Fourth Amendment should preclude introduction of the evidence so obtained pursuant to the Fifth Amendment Due Process clause. Moreover, the issue of judicial integrity, i.e. the obligation of federal judges to adhere to the oath of office and uphold the Constitution, seems equally compelling. *See Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).[11]

The Supreme Court, however, has not adopted a constitutional rationale for the exclusionary rule. Rather, it has explained that the basis for suppression is that the denial of the fruits of unlawful conduct acts to deter the violation of the Constitution. *See Terry v. Ohio*, 392 U.S. 1, 12, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct.... Thus its major thrust is a deterrent one"). Indeed, the Court has now explicitly rejected a constitutional footing and has relegated the basis for the

exclusionary rule to "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). This deprecation of the rule, and thus inevitably the right, is one of the factors leading to the court's decision in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

In *Leon* the Court concluded that the exclusionary rule "should be modified so as not to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *Id.* at 900, 104 S.Ct. 3405. The Government's reliance on *Leon* in the present case seems misplaced.

The instant case, unlike *Leon*, does not turn on a good faith reliance on a facially valid warrant subsequently found to be issued without probable cause. Rather, the case involves a search conducted outside the authority of the warrant, i.e. outside the areas which the warrant authorized to be searched. *See Garrison, supra.* The very rationale for *Leon*, good faith reliance on the Magistrate's authority, is simply inapplicable to a case such as this.

At best, from the Government's view, the matter at bar may be viewed as one in which the issue of what could be searched was ambiguous. In such circumstances, however, the executing officers are not relying on the terms of the warrant, but on their personal view as to how the ambiguity should be resolved. Whatever their good faith, under such circumstances, they are clearly relying on something other than the magistrate's determination, which is the sine qua non of *Leon*.[12]

---

11. The tortured history of the exclusionary rule suggests that what this court sees as a straight forward application of the rule of law, is viewed by others, equally devoted to our constitutional system, quite differently. *See* 1 La Fave *Search and Seizure*, § 1.1.

12. Of course, there may be cases in which an apparently ambiguous warrant is readily rendered certain by the facts on the ground. In such circumstances, the officers are relying on the warrant's authority as reasonably understood by virtue of the facts, and according-

If read as a case of ambiguity not readily resolved by the facts, the matter at bar is analogous to addressing overbroad warrants. In both the vice is that the warrant has left to the officer in the field rather than the magistrate the determination of what should be searched. In this Circuit it is established that such a warrant, because it fails the particularity test, cannot be a basis for good faith reliance, *see United States v. Crozier,* 777 F.2d 1376 (9th Cir.1985), and the same result should, and this court concludes does, apply here.

In sum, the court concludes that good faith reliance is inapplicable to the instant case and will not save the unlawful conduct of the searching officers.

## IV.

## ORDER

For all the above reasons, defendant Cannon's motion to suppress the evidence seized from the two storage sheds is GRANTED.

IT IS SO ORDERED.

---

ly, good faith is irrelevant. Here, however, the court is faced with a very different scenario. Here, the warrant as interpreted by the court under its obligation to give it a generous

reading is certain, but limited. The officers, however, exceed that specific authorization, and thus cannot be said to be relying on the warrant.