Robert SIEBERT and Pamela
Siebert, Plaintiffs,

v.

David SEVERINO, Bill Meyers, Deputy
Waters and Unknown Illinois State
Trooper, Defendants.

No. 98–1411.

United States District Court,
C.D. Illinois.

May 24, 2000.

David L. Stanczak, Dunn Stanczak & Willard, Bloomington, IL, for Robert Siebert, plaintiff.

Mikkie R. Schiltz, Costigan & Wollrab, Bloomington, IL, Karen L. McNaught, Sarah L. Pratt, Atty Genl, Springfield, IL, for David Severino, defendant.

## ORDER

MIHM, District Judge.

This matter is before the Court on Defendant, David Severino's ("Severino"), Motion for Summary Judgment. The other named Defendants were previously dismissed with prejudice as parties by the Court pursuant to Plaintiffs' Motion for Voluntary Dismissal. For the reasons stated herein, the Motion for Summary Judgment is granted. This case is terminated.

### Background

This action arises from the seizure of three of Plaintiff Pamela Siebert's ("P.Siebert") horses and the investigation that preceded the seizure. She and her husband, Plaintiff Robert Siebert ("R.Siebert"), have brought an action pursuant to 42 U.S.C. § 1983, alleging that Severino, an approved humane investigator for McLean and Woodford Counties, Illinois, violated their Fourth Amendment right to be free from unreasonable searches and seizures and have deprived them of property without due process in violation of the Fourteenth Amendment. In addition to the § 1983 claims, each of the Sieberts has brought pendent state law claims for trespass and violation of the Humane Care for

Animals Act. Severino is being sued in his individual capacity.

The Sieberts own property in Carlock, Illinois. The property is approximately four and one half acres and a home and barn sits thereon. The barn, which is surrounded by a fence, is approximately 60 feet from the home. In addition to the barn, a riding area with turn-outs and a pasture ("the paddock") are contained within the fence. The horses kept in the paddock go in and out of the barn at will.

In December, 1996, the three horses relevant to this case were kept on a seven-acre pasture ("the pasture") that was about a five-minute walk from the Sieberts' residence. The pasture is distinct from the paddock, and the Sieberts do not own the pasture. Instead, it is owned by Deb Oberg, who allows the Sieberts use of her property. (P. Siebert Dep. at 27–28). Other than a tepee and a washed-out bridge, there were no structures on the pasture during the times relevant to this case. However, the contours of the pasture and the trees thereon established a windbreak for the horses. There was no water tank on the pasture from which the horses could drink. However, there was a creek that ran through the property, and it is undisputed that if the creek were frozen, R. Siebert would break the ice so that the horses could drink from the creek.[1] The Sieberts would feed the horses in the pasture by tying buckets of grain to the fence posts and throwing hay on the ground. According to R. Siebert, the horses were fed twice a day.

Prior to December 16, 1996, Severino "received a communication that the horses at the Siebert location were in a fenced area with no shelter or water." (Severino Aff., ¶ 5). On December 16th, Severino inspected the horses in the paddock and the pasture. While inspecting the horses in the paddock, he entered the Sieberts' barn, which is located approximately 60 feet from their residence. Severino did not have a warrant when he entered the barn. In the barn were the feed and hay for the horses kept in the paddock. He found no problems with the horses in the paddock.

However, after he inspected the horses in the pasture, he taped a Notice of Apparent Violation on the door of the Sieberts' home. The Notice stated that Sieberts had failed to provide the three horses in the pasture with adequate shelter and protection from the weather and failed to provide them with humane care and treatment. (Dft.Ex.A–2). The Notice also informed the Sieberts that the horses were standing in the mud, there were no dry areas where they could stand, and they were drinking from the creek because there were no water receptacles. (*Id.*). The Sieberts were given 72 hours to take corrective action.

The maximum and minimum temperatures on December 16th were 42° and 28°, respectively. (Dft.Ex. C, Record River and Climatological Observations at Normal, Illinois). In the days leading up to the investigation, the maximum and minimum temperatures were, respectively: 37° and 24° (10th); 56° and 36° (11th); 41° and 37° (12th); 39° and 27° (13th); 44° and 28° (14th); and 45° and 39° (15th). (*Id.*).

On December 19, 1996, Severino went back to the pasture and impounded the horses. The Notice of Impoundment described the three horses that were impounded and listed the alleged deficiencies by referencing the deficiencies listed in the Notice of Apparent Violation. The Notice of impoundment further stated, "The violator may request a hearing to appeal the impoundment. A person desiring a hearing shall contact the Department [of Agri-

---

1. This statement of fact is contained in both Severino's and the Sieberts' Statements of Undisputed Facts. The Court is perplexed by Severino's offering of this statement in his Statement of Undisputed Facts and his subse- quent objection on relevance grounds when the same statement is offered by the Sieberts in ¶ 4 of their Statement of Additional Undisputed Facts.

culture] within 7 days from the date of impoundment." (Dft.Ex.A–6). The Notice was given to the Sieberts' son, who was over the age of 12 and under no legal disability. The maximum and minimum temperatures on December 19th were 14 and 4 degrees, respectively. (Dft.Ex. C).

The three horses were removed from the pasture for "a couple of days." (Dft.SUF, ¶ 31). It is not clear from the parties' Statements of Undisputed Facts what procedures the Sieberts went through in order to secure the return of the horses. However, it is undisputed that the Sieberts did not request a hearing before the Department of Agriculture to contest the propriety of the impoundment.

### Summary Judgment Standard

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 323, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue of fact for trial. See Celotex Corp., 477 U.S. at 324, 106 S.Ct. 2548. This Court must then determine whether there is a need for trial—whether, in other words, there are any genuine material factual issues that can properly be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. See Anderson, 477 U.S. at 250, 106 S.Ct. 2505.

### Discussion

Severino has moved for summary judgment, arguing that the Sieberts cannot prevail on the merits of their § 1983 claims and, in the alternative, that their claims are barred under the doctrine of qualified immunity. Similarly, with regard to the pendent state law claims for trespass and violation of the Humane Care for Animals Act, Severino argues that the Sieberts cannot prevail on the merits and, in the alternative, the claims are barred under the doctrines of sovereign and public official immunity.

### A. § 1983 Claims

■ In a case, such as this, where the defense of qualified immunity is raised, the Court must first determine whether Plaintiffs have alleged a deprivation of a constitutional right. See County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). In County of Sacramento, the Supreme Court explained:

> [T]he generally sound rule of avoiding determination of constitutional issues does not readily fit the situation presented here; when liability is claimed on the basis of a constitutional violation, even a finding of qualified immunity requires some determination about the state of constitutional law at the time the officer acted. What is more significant is that if the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct

would tend to remain uncertain to the detriment both of officials and individuals. An immunity determination, with nothing more, provides no clear standard, constitutional or non-constitutional.... [T]herefore, the better approach is to determine the right before determining whether it was previously established with clarity.

*Id.; see also Sivard v. Pulaski County,* 17 F.3d 185, 189 (7th Cir.1994) ("An analysis of qualified immunity is appropriate only after the resolution of the purely legal question of whether [the plaintiff] has alleged a violation of a constitutional right."). Hence, regarding Plaintiffs' § 1983 claims, this Court must first determine whether there is sufficient evidence from which a reasonable trier of fact could conclude that Severino violated the Sieberts' constitutional rights. If so, the Court's analysis shifts to Severino's claim of qualified immunity.

### 1. Fourth Amendment Claims

There are two parts to the Sieberts' Fourth Amendment Claims. They argue that Severino entered upon their property and the pasture without probable cause and a warrant, *i.e.,* illegal search, and impounded the horses without probable cause and a warrant, *i.e.,* illegal seizure.

■ It is undisputed that during the times relevant herein, R. Siebert did not have any type of property interest in the three horses that were seized. Consequently, he does not have standing to complain of an alleged illegal seizure of the horses. Additionally, even assuming that the Sieberts had some type of property interest in the pasture and, therefore, have standing to assert that Severino's search of the pasture constituted an illegal search, the claim is without merit. "[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects' is not extended to the open fields." *Hester v. United States,* 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924). Consequently, "[T]he govern-ment's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." *Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); *see also id.* at 180, 104 S.Ct. 1735 ("[T]he common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields.").

However, during oral argument, the Sieberts' attorney still asserted that his clients had a reasonable expectation of privacy in their barn. The Court is not unsympathetic to the Sieberts' claim that Severino should not have entered their barn. No owner of property, whether in the country or in the city, appreciates an intrusion of their property by another person, especially when the other person is a government actor. However, merely stating that one has a reasonable expectation of privacy in their property does not make it so. The record is void of any evidence from which a reasonable trier of fact could conclude that the Sieberts had a reasonable expectation of privacy in their barn, which they concede is outside the curtilage of their home.

■ Because the Sieberts have conceded that the barn is not part of the curtilage surrounding their home and because the record is void of any evidence that they nevertheless had a reasonable expectation of privacy in their barn, the Court finds that Severino did not violate the Fourth Amendment when he searched the barn without a warrant. *See United States v. Dunn,* 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) ("[T]he Fourth Amendment protects the curtilage of a house and ... the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that area in question should be treated as the home itself."); *see also Oliver,* 466 U.S. at 180, 104 S.Ct. 1735 ("[T]he common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields.").

The last Fourth Amendment claim is whether Severino's impoundment of the horses was constitutionally unreasonable. This claim presents two issues since P. Siebert asserts that Severino had neither probable cause nor a warrant when the impoundment occurred.

■ Section 3 of the Humane Care for Animals Act provides:

Each owner shall provide for each of his animals:

(a) sufficient quantity of good quality, wholesome food and water;

(b) adequate shelter and protection from the weather;

(c) veterinary care when needed to prevent suffering; and

(d) humane care and treatment.

510 ILCS 70/3. P. Siebert argues that she was not in violation of § 3 when the horses were impounded, and, therefore, there was no probable cause to impound her horses. Severino does not contend that the horses were malnourished or were being denied proper veterinary care. However, he does contend that the horses did not have adequate shelter, an adequate water supply, or a dry place to stand. There are disputed issues of material fact regarding the water supply. Although Severino contends in his Motion for Summary Judgment that the creek from which the horses were supposed to drink was frozen over, he stated in the Notice of Apparent Violation that the horses were drinking from the creek, which reasonably implies that the creek was not frozen. Moreover, although Severino asserts that the horses were standing in mud, a reasonable finder of fact could conclude that the entire seven-acre pasture was not muddy, but also had grassy areas in which the horses could stand.

However, it is undisputed that the rolling hills in the pasture were the only "shelter" the horses had from the weather. Neither party contends that the tepee or washed-out bridge on the pasture provided any type of protection from the weather.

It is not clear whether rolling hills, which according to the Sieberts provided a windbreak for animals, would constitute "adequate shelter and protection from the weather" under § 3 of the Act. The Court has not found, and neither party has cited, any Illinois case law interpreting the scope of this requirement in § 3. It seriously doubts that rolling hills, without more, constitute adequate shelter and protection from the weather in the month of December. Therefore, the Court believes that as a matter of law Severino had probable cause to believe that P. Siebert was in violation of § 3 of the Act for failing to provide adequate shelter and protection from the weather.

■ Nevertheless, assuming for the sake of argument that rolling hills constitute adequate shelter and protection from the weather and, consequently, Severino did not have probable cause to believe the horses did not have adequate shelter and protection, he is entitled to qualified immunity. In *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir.1998), the Seventh Circuit stated, "[W]hen a defense of qualified immunity has been raised, we will review to determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed." (Citations omitted). In light of the fact that at the time of the seizure the law was not clearly established as to what the phrase "adequate shelter and protection from the weather" meant, a humane investigator could have reasonably concluded that the lack of a physical shelter to house the animals, at least during the winter months, was equivalent to a failure to provide adequate shelter and protection from the weather. Therefore, a reasonable investigator could have mistakenly believed that P. Siebert was in violation of § 3 of the Act for failure to provide adequate shelter.

Of course, immunity from P. Siebert's probable cause claim does not address her

claim that Severino did not have a warrant when he seized the horses. The Court initially notes that P. Siebert has failed to come forward with any evidence from which a reasonable trier of fact could conclude that, in fact, Severino did not have a warrant when he seized the horses. As the nonmoving party with the burden of proof at trial, she may not simply sit back and poke holes in Severino's Motion for Summary Judgment. *See Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Instead, she has the burden of coming forward with admissible evidence to support her claim. *See Celotex Corp.,* 477 U.S. at 322–26, 106 S.Ct. 2548. Baldly stating that Severino did not have a warrant to seize the horses without citation to the record falls short of meeting this burden. It is likely that she is unable to cite to any part of the record supporting her statement that Severino did not have a warrant when he seized the horses because of the lack of discovery in this case. At oral argument, Severino's attorney represented that the Sieberts' attorney had failed to propound any interrogatories, requests to produce, or requests to admit and further failed to depose Severino. The Sieberts' attorney did not contend otherwise. Absent an admission by Severino that he did not have a warrant—an admission that if made is not cited by the Sieberts in their Statement of Additional Undisputed Facts or legal briefs—the record is void of any evidence that Severino did not have a warrant. Hence, P. Siebert's warrantless seizure claim fails on this ground alone.

■ Assuming Severino did not have a warrant when he seized the horses, a strong argument could be made that the seizure was unreasonable. *See Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (a warrantless seizure is per se unreasonable unless justified by an exception to the warrant requirement). However, the apparent unreasonableness of Severino's alleged warrantless seizure is complicated by the fact that §§ 11 and 12 of the Humane Care for Animals Act do not have a warrant requirement. These provisions, which authorize the impoundment of animals when an owner has violated the Act and has failed to take the required corrective action, only require an investigator to "contact the Department [of Agriculture] and request authorization to impound the animal or animals...." 510 ILCS 70/11(b). "The Department will authorize the impoundment if a review of facts gathered by the humane investigator indicates a violation of Section 3 ... has occurred and the violator ... has failed or refused to take corrective action...." *Id.*

During oral argument P. Siebert's attorney argued that because it is well-established that a warrant is needed prior to seizing property absent some exception to the warrant requirement, it does not matter that the Act only requires a humane investigator to obtain approval from the Department of Agriculture prior to seizing animals; a reasonable law enforcement officer should know that a warrant is also required. Although the warrant requirement is well-established, the Court finds that Severino is entitled to qualified immunity due to the existence of extraordinary circumstances. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (even if the law is clearly established, an official is entitled to qualified immunity if he neither knew or should have known of the relevant legal standard). Presumably, Severino obtained permission from the Department of Agriculture prior to impounding the horses, as required by §§ 11 and 12 of the Act. P. Siebert does not contend otherwise. Severino should not be held liable for acting pursuant to a statute passed by the Illinois General Assembly that has yet to be challenged and held unconstitutional in a court of law and, moreover, for acting pursuant to a statute that is not challenged either on its face or as applied in this case. *Cf. United States v. X–Citement Video, Inc.,* 513 U.S. 64, 73, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) ("[W]e do not impute to Con-

gress an intent to pass legislation that is inconsistent with the Constitution"). To hold otherwise would place law enforcement officials in the position of second guessing the collective judgment of an elected representative body that is presumed to pass lawful and constitutional legislation. This is not something a reasonable law enforcement officer is required to do in order to avoid civil liability. *Cf. V–1 Oil Co. v. State of Wyo., Dept. of Envtl. Quality,* 902 F.2d 1482, 1489 (10th Cir.1990) (applying the extraordinary circumstances, qualified immunity defense where a law enforcement officer conducted a warrantless search after being advised that a particular statute, which had yet to be tested in any court, authorized the search).

In summary, the Court grants summary judgment in favor of Severino on the Sieberts' Fourth Amendment claims.

### 2. Due Process Claims

In his Motion for Summary Judgment, Severino argues that he did not deprive the Sieberts of property without due process and, alternatively, argues that he is entitled to qualified immunity. At the outset, the Court finds that R. Siebert lacks standing to assert a procedural due process claim for the same reason he lacks standing to assert an unreasonable seizure claim: he has no property interest in the horses. Consequently, summary judgment is granted in favor of Severino and against R. Siebert. However, as the owner of the horses, P. Siebert does have standing, and she claims that she was deprived of due process because there was no predeprivation hearing prior to the seizure taking place.

■ The parties' due process arguments center on four United States Supreme Court cases that collectively set forth the standard for determining whether a due process hearing is necessary prior to a property or liberty deprivation or whether a post-deprivation remedy or hearing provided by the State is all that is required.

*See Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *see also Easter House v. Felder,* 910 F.2d 1387, 1396–97 (7th Cir.1990) (discussing these Supreme Court cases), *cert. denied,* 498 U.S. 1067, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991). As a general rule, predeprivation process is required before a person is deprived of his property by the State. However, deprivations that are random and unauthorized or necessitated by exigent circumstances need not be preceded by a due process hearing so long as adequate post-deprivation process or remedies are available. *See Easter House,* 910 F.2d at 1396–97.

P. Siebert argues that the deprivation in this case—the taking of her horses—was anything other than random or unauthorized since she was given 72 hours to take corrective action and because the Humane Care for Animals Act authorizes the impoundment of animals from owners who fail to take corrective action. Moreover, although neither party really addresses the issue, a reasonable argument can certainly be made that the condition of the horses was not sufficiently serious as to necessitate an emergency deprivation. At oral argument, Severino's attorney admitted that the horses were not malnourished, there is no evidence in the record that the horses were in poor health, and, again, P. Siebert was given 72 hours to take corrective action. Each of these facts, collectively and individually, cuts against any claim of exigent circumstances.

However, the Act provides for only post-deprivation process. Section 12(b)(6) of the Act states:

The violator may request a hearing to appeal the impoundment. A person desiring a hearing shall contact the Department of Agriculture within 7 days

from the date of the impoundment and the Department will hold an administrative hearing within 7 days after receiving a request to appeal the impoundment. If a hearing cannot be held prior to the expiration of the 7–day impoundment period, the Department shall notify the humane society that it cannot sell, offer for adoption or dispose of the animal or animals until a final decision is rendered and all of the appeal processes have expired.

510 ILCS 70/12 (quotation marks omitted). Section 14 of the Act further provides for judicial review under the Illinois Administrative Procedures Act of any adverse administrative ruling. *See* 510 ILCS 70/14. P. Siebert does not challenge the constitutionality of the Act's review procedure, either as applied or facially, and this Court's research reveals that the procedure has yet to be tested in a court of law on due process grounds. However, she implicitly argues that regardless of what the Act provides, it is well-established that a predeprivation hearing is required absent an emergency situation or a random, unauthorized deprivation; hence, she should prevail on her due process claim because Severino violated clearly established constitutional law.

■ Admittedly, it was well-established as of December 19, 1998, that predeprivation process was required absent an emergency or a random, unauthorized deprivation. However, P. Siebert's due process claim fails under the defense of qualified immunity for the same reason that her warrantless seizure claim fails under the same defense. The Court does not believe that a reasonable government actor is required to come to a conclusion that predeprivation process is due despite the fact that the Illinois General Assembly has come to a different conclusion, whether correctly or incorrectly, by passing a statute that provides for only post-deprivation process. This untested statute is presumptively constitutional, and it was not up to Severino to second guess the General

Assembly. It is the State, not a humane investigator or any other law enforcement official, which provides the due process either prior to or subsequent to a seizure. When the General Assembly has provided for post-deprivation process only, civil liability should not attach to a humane investigator for his failure to create and initiate predeprivation process. Accordingly, the Court finds that the extraordinary circumstances, qualified immunity defense bars P. Siebert's due process claim, and summary judgment is granted in favor of Severino and against P. Siebert.

In closing, the Court wishes to reiterate that the constitutionality of the Humane Care for Animals Act has not been challenged, either as applied or facially, by the Sieberts. Accordingly, the Court expresses absolutely no opinion on the Act's constitutionality.

## B. Pendent State Law Claims

The Sieberts claim that Severino violated the Humane Care for Animals Act by the way he treated the horses during and after their seizure. They further claim that he trespassed when he entered the pasture and their barn and subsequently seized the horses. Severino argues that there is not a private right of action under the Humane Care for Animals Act and that he was not a trespasser when he went onto the Sieberts' property and the pasture and seized the horses. Whatever merit there may be to Severino's arguments, this Court is unable to address whether he is entitled to summary judgment on the merits because the Sieberts' claims for violation of the Humane Care for Animals Act and trespass must be litigated in the Illinois Court of Claims.

■ Eleventh Amendment sovereign immunity does not shield individual defendants like Severino from federal court jurisdiction over pendent state law tort claims. *See Benning v. Board of Regents of Regency Univ.*, 928 F.2d 775, 778–79 (7th Cir.1991). However, this Court is nonetheless bound by state rules of immu-

nity regarding state law causes of action. *Id.* In that regard, this Court's starting point is the Illinois Court of Claims Act, which vests that court with "exclusive jurisdiction to hear and determine ... [a]ll claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit...." 705 ILCS 505/8(d). Although this statute does not directly address actions against individuals like Severino, the Illinois Supreme Court addressed the statute's application to suits against state officers for negligent operation of a vehicle in *Currie v. Lao,* 148 Ill.2d 151, 170 Ill.Dec. 297, 592 N.E.2d 977 (1992). In that case, the plaintiff filed suit in the state circuit court against an Illinois state trooper for damages resulting from an accident attributed to the trooper's alleged negligent driving. The plaintiff alleged that the trooper, who was responding to a non-emergency police call, had been driving the wrong way on a one-way street, not maintaining a proper lookout, and not controlling his vehicle. *See id.* at 982. The Illinois Supreme Court held that state employees may in some instances be entitled to sovereign immunity and, if so, are insulated from suit outside the Court of Claims. Such immunity depends on the "source of the duty the employee is charged with breaching." *Id.* at 980. The court explained:

> Where the charged act of negligence arose out of the State employee's breach of a duty that is imposed on him solely by virtue of his State employment, sovereign immunity will bar maintenance of the action in the circuit court. Conversely, ... where an employee of the State, although acting within the scope of his employment, is charged with breaching a duty that arose independently of his State employment, a suit against him will not be shielded by sovereign immunity.

*Id.* (citations omitted).

Based on this reasoning, the *Currie* court noted that sovereign immunity does not ordinarily shield state employees from claims of negligent driving, as the duties breached do not, in most instances, arise out of their state employment. However, the court noted that immunity would attach when "a State employee's manner of operating a vehicle [is] ... unique to his employment." *Id.* at 981. Therefore, although the *Currie* court refused to extend sovereign immunity to the trooper in that case, it distinguished his conduct from the conduct of a law enforcement officer engaged in a high speed chase. *See id.* at 981–82 (citations omitted). Because an officer in a high speed chase acts as "only a governmental official is authorized to act," the Illinois Supreme Court reasoned that he would be entitled to sovereign immunity.

■ This case is analogous to the *Currie* court's hypothetical example of a law enforcement officer in a high speed chase. The Humane Care for Animals Act provides, in pertinent part:

> Upon receiving a complaint of a suspected violation of this Act, a Department Investigator, any law enforcement official, or an approved humane investigator may, for purposes of investigating the allegations of the complaint, enter during normal business hours upon any premises where the animal or animals described in the complaint are housed or kept, provided such entry shall not be made into any building which is a person's residence, except by search warrant or court order....

510 ILCS 70/10. The Act further provides:

> (a) If an investigator under Section 10 discloses that a violation of this Act has been committed, the approved humane investigator shall furnish the violator, if known, with a notice of violation, and state what action is necessary to come into compliance with this Act and that a maximum of 48 hours be granted in which to take corrective action.

(b) If the violator fails or refuses to take corrective action necessary for compliance or if the violator is still unknown after an attempt to identify ownership, the humane investigator shall contact the Department and request authorization to impound the animal or animals. The Department will authorize impoundment if a review of facts gathered by the humane investigator indicates a violation of Section 3 of this Act has occurred and the violator, if known, has failed or refused to take corrective action necessary for compliance.

510 ILCS 70/11. Lastly, § 12 of the Act provides:

(a) When ... the violator fails or refuses to take corrective action necessary for compliance pursuant to Section 11 of this Act, the Department may authorize a humane society impound the animal in a facility which will provide the elements of good care as set forth in Section 3 of this Act, where such animals shall be examined by a licensed veterinarian.

510 ILCS 70/12. By investigating the complaint of alleged violation of the Act and by subsequently seizing the three horses in the pasture, it is clear that Severino was acting only as an Illinois governmental official is authorized to act. Furthermore, although the Sieberts disagree with the conclusions Severino reached regarding their care of the horses, they do not contend that Severino acted outside the scope of the authority vested in him under the Humane Care for Animals Act. As previously set forth, that Act vests in him the power to investigate complaints and, without a warrant, to enter upon property (other than a building that is a residence) to investigate the complaint. The Act further vests him with the power to impound animals after the owner has failed to come into compliance with the Act. The record is void of any indication that Severino did anything outside the authority vested in him by the General Assembly and, therefore, the pendent state law claims against him must be brought in the Court of Claims. *See* 705 ILCS 50⅝ (d); *see also Benning,* 928 F.2d at 779 ("[T]he common law gloss affixed to the Illinois statute indicates that suits against individuals who act within the scope of their employment are deemed to be suits against the state actionable only in the court of claims.").

In conclusion, the Court finds that it lacks subject matter jurisdiction to entertain the pendent state law claims.

### Conclusion

For the foregoing reasons, summary judgment is entered in favor of Severino and against the Sieberts on their § 1983 Fourth Amendment and due process claims (Counts I and V). Furthermore, the Court lacks subject matter jurisdiction to entertain the Sieberts' Humane Care for Animals Act and trespass claims against Severino. Accordingly, Counts IX, X, XI, and XV are DISMISSED WITHOUT PREJUDICE. The claims against Unknown Illinois State Trooper (Counts IV, VIII, XIV, and XVII) are DISMISSED WITHOUT PREJUDICE since the Sieberts have yet to discover the trooper's identity and serve him with the Complaint. This case is TERMINATED.