[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from the Lucas County Court of Common Pleas. There, following the return of a jury verdict, appellant was convicted on six counts of dog fighting, one count of possession of a weapon while under disability, and one count of cultivation of a controlled substance. Because we conclude that the convictions for dog fighting and cultivation of a controlled substance were against the manifest weight of the evidence, we reverse in part.
 {¶ 2} Appellant, Otha Jones, was indicted in three cases as follows: Case No. CR99-2353, five counts of dogfighting, in violation of R.C. 959.16(A)(3) and R.C. 959.99(G); Case No. CR99-2430, one count of having a weapon while under disability, in violation of R.C. 2923.13(A)(2) and one count of dogfighting, in violation of R.C. 959.16(A)(3) and R.C.959.99(G); Case No. CR00-1937, one count of illegal cultivation of marijuana, in violation of R.C. 2925.04(A) and (C)(4)(d). Appellant pled not guilty and sought to suppress evidence. After conducting a hearing, the trial court denied appellant's motion to suppress. The cases were consolidated for both trial and this appeal.
 {¶ 3} The following evidence was presented at trial. On August 12, 1999, the Lucas County Sheriff Department conducted an "eradication program". This involved the use of helicopters for surveilling rural property in an effort to find marijuana plants. Marijuana was sighted in several open areas on property located at or adjacent to 10521 Angola Road, Holland, Ohio. The spotters in the helicopter notified the ground crew who met them at the property. No persons were present at the property which contained a house, two barns, and a fenced in pond. Officers in the ground crew entered the property, cut down, and seized several tall marijuana plants which were growing in open areas and near an outbuilding located on the property. The plants had been staked with twine, to prevent breakage as they were growing. The plants were labeled and transported for testing. The crew also saw a dried stalk of marijuana hanging on an open door of one of the barns, but did not enter any of the buildings. The report on the tested material showed a total of 4,884.1 grams or 10.5 pounds of marijuana.
 {¶ 4} One of the eradication unit officers notified Detective Douglas Allen of their actions. Allen, who had been investigating appellant's possible involvement in organized dog fighting, applied for and was granted warrants to search the house and other buildings. Testimony was presented at trial that appellant was purchasing the Angola Road real estate ("Angola property"), which actually consisted of three separate properties, on land contract. Although none of the parcels were yet deeded to appellant, the electric account was in his name and the land owner sent him the tax bills for payment.
 {¶ 5} During the search of the east barn, various officers testified that they found several treadmills (one intact, the others in parts), plywood pieces that appeared to fit together in a four-sided pen, tractors, four-wheelers, an alleged training calendar, and some animal hides. In the west barn, the officers found nine dogs housed in individual locked kennels, a horse, two to three "bite sticks," and kennel supplies, including worm medicine, injectable penicillin, and antibiotic pills in a prescription bottle for a specific dog. The dogs consisted mainly of pit bulls, two Fila Braserios, and a bull mastiff. Two alligators were also removed from the fenced in pond. No charges were ever filed regarding the reptiles.
 {¶ 6} Detective Allen testified that he had been surveilling the Angola Road property. He was investigating alleged dog fighting. Allen stated that he had driven by the property on approximately 40 to 60 days between February 1999 and August 12, 1999. The detective saw appellant on the property eight to ten of those times and only twice with a dog. On February 24, 1999, Allen observed several black males "working" dogs. Two vehicles present on the property were registered to people other than appellant.
 {¶ 7} On February 25, 1999, he observed appellant exercising a black dog with white on its chest. Appellant had some type of harness which required the dog to pull him around. Appellant walked the dog around the front of the house and the yard. Allen did not, however, classify this as "training." On another occasion, Allen said he saw appellant and his white suburban vehicle with a dog back by the barns, "doing something." He could not discern whether the dog was black or brown, or identify it specifically. On another day, Allen testified that appellant went into the west barn for approximately two and one-half hours, but could not see what appellant was doing.
 {¶ 8} On April 4, 1999, Easter weekend, Allen saw a group of unidentified people out by the pond area. On the Saturday night of that weekend, Allen testified that there were fifteen to thirty chairs set in rows by the pond where a bonfire was held. On July 4, 1999, Allen observed another group activity, smaller than the one at Easter. Again, he could not identify the people in attendance, other than appellant's vehicle. That was the last time Allen remembered seeing appellant on the Angola property.
 {¶ 9} Allen testified that dog fighting groups are very secretive — training is done in secret and cars are parked away from the fight location, so as not to draw attention. He further stated that on most of the drive-bys, no one was observed at the property. He acknowledged that many different people had been seen on the property, some with and others not in the company of appellant. No photos were ever taken of any of the activities observed. He stated that he had never seen appellant breed, sell, or train any of the dogs recovered from the property. Allen acknowledged that he had never seen a dog fight on the property.
 {¶ 10} Detective Christopher Gill, the officer who took inventory of the items discovered on the Angola property, testified that no fingerprints were taken on any of the items. Detective Glenn Pitzen, a member of the surveillance team, testified that in February 1999, he saw a number of unidentified males and appellant on the property. He said appellant was seen twice on the property in the spring of 1999. On another occasion, he observed six to seven people by the west barn. He noticed appellant's white suburban vehicle, but could never positively identify appellant as being one of the people he observed. Of the 30 to 35 times he observed the property, Pitzen said he saw appellant only twice, "doing the dogs." Pitzen stated he also saw another unidentified black male with a pit bull on a tether. Pitzen stated that although he saw appellant with a dog pulling on its tether, he never saw any dogs being vicious. He also acknowledged that he never saw a dog fight or appellant facilitating a dog fight on the property.
 {¶ 11} According to Tom Skeldon, Lucas County dog warden, five of the dogs had puncture wounds which were in various stages of healing. The dogs' wounds were mostly on the front legs, heads and neck, areas indicating that the animals had been involved in a dog fight. He noted, however, that the dogs had food and water and the kennels were clean. Overall, the dogs appeared "fairly well-cared for." When the dogs were removed from the kennels, they did not act viciously or create a danger to deputies.
 {¶ 12} Skeldon also testified that further back on the property near a wooded area, the officers found 20 to 30 dog houses. Some of the houses had heavy tow chains attached to car axles which were anchored in the ground. Skeldon stated that the axles could be used for "post agitation," a technique which gets dogs excited and anxious to fight. There were some railroad ties laid together in the floor and sides of what Skeldon opined could be made into a dog fighting pit. He also noted, however, that the area had not been used in the previous week to ten days. By the time of trial, three of the dogs had been claimed: a fila by Ruth Jones, appellant's mother; a fila by Demetria Blackshear, appellant's girlfriend; and a bull mastiff by a man named Charles Decembly. None of the pit bulls were claimed. Several months prior to trial, the remaining seven dogs had been euthanized by the dog warden, to save kennel costs.
 {¶ 13} On the same day as the Angola Road search, Allen also obtained warrants for several other properties connected with appellant, including two on Hackett Street, located in Toledo, Ohio. Appellant's address was listed as 537 Hackett Street, a house owned by his mother, Ruth Jones. When the Toledo Police Department narcotics unit served the warrant at 537 Hackett Street, appellant, his girlfriend, Demetria Blackshear, and their two-year-old child were at home. A loaded 9mm Beretta handgun was found in a medicine cabinet located upstairs in a bathroom off the master bedroom. A later investigation revealed that appellant was the registered owner of the gun. A small amount of marijuana residue was also found at this residence. After serving the warrant on 527 Hackett Street, the police found and seized a black and white pit bull which was chained in the basement.
 {¶ 14} Dr. Dale Wright, a veterinarian, testified as an expert on behalf of the state. He discussed the indications of dog fighting from wounds and scars. Dr. Wright stated that six of the ten young adult dogs removed from the Angola and Hackett properties had scars, scabs, and puncture wound injuries which were "consistent with dog fighting." The wounds ranged from two weeks old to scars which were up to a year old. The other four did not have any such indications. According to Dr. Wright, the dogs had healing wounds or scars on their rear legs, sides, ribs, as well as their heads, muzzles, and front legs. A video tape was made during the examinations of the dogs. As used by Dr. Wright, "dog fighting" meant all fight encounters between dogs, whether as an organized event or occurring by chance. The veterinarian stated that the dogs' injuries and scars only indicated repeated encounters over a period of time.
 {¶ 15} Another witness, Otis Williams, testified that the Angola property had originally been in his name, but had been switched out of his name three or four years ago. He denied any suggestion that he had been romantically involved with appellant's sister. He also testified that he never saw appellant with a dog at the property.
 {¶ 16} In exchange for a plea bargain deal on another charge, Richard Riffe also testified. He testified that he had worked for appellant through Stacey Howe, remodeling houses at the Angola property, 527 Hackett Street, and several locations. Riffe stated that he had seen items stored in the barns on the Angola property. He also said that he had helped Stacey Howe feed and water the horse and dogs two times a day from April to December 1998. Riffe later changed his testimony, stating that he was not there every day during those eight months and had never been there at all during 1999.
 {¶ 17} Riffe testified that appellant drove a white suburban vehicle and a 1970 black pickup truck. Riffe testified that he helped appellant add wooden sides to a treadmill that appellant had purchased. The treadmill had a chain across the front which could hook onto a dog collar. Riffe first said the only dog he saw appellant with was a dog which occasionally came with him in the suburban. Later, Riffe said he had seen appellant with a dog running on a treadmill, but did not stay to watch the entire time. Riffe then said that appellant would walk dogs around the block at night while riding a bike. He stated that he also saw Derrick Banks, "Teddy," and "Dennis," and other people that he did not know at the Angola property. Riffe stated that a dog which was chained to a tree was at first friendly, but became unfriendly to him over time. He testified that he never saw a dog fight on the Angola property.
 {¶ 18} Riffe also stated that once, at least a year and a half before trial, he had seen appellant pull into the property in his suburban and allegedly sell a baggie of marijuana to Stacey Howe. He stated that he had seen marijuana growing outside the barn, did not know how it got there, but never saw appellant plant or tend to the plants.
 {¶ 19} The state rested and appellant moved for acquittal which was denied. On defense, appellant presented the following testimony.
 {¶ 20} Stacy Howe testified that he lives across from the Angola property in a house owned by Ruth Jones, appellant's mother. He stated that he worked for appellant on the remodeling of the Angola house and the 527 Hackett house, as well as several other properties. Ricky Riffe had also worked for appellant but had been let go when some tools turned up missing.
 {¶ 21} Howe has seen appellant out on the property to ride the horse, but never saw appellant doing anything with the dogs kenneled there. Howe testified that a man named "Erwin" kept the dogs in the barn. Erwin, a six feet, one and one-half inch black male and another shorter, heavier black male came out to the property. Howe stated that he has been on the Angola property regularly especially in the evenings. Howe testified that he originally took care of the barns, the animals, and cut the grass for appellant. In exchange, appellant paid him and permitted him to keep a vehicle stored in one of the barns. He said he also occasionally fed and watered the dogs for Erwin, when he failed to show up. Howe stated that when interviewed after the raid, he had told the police about "Erwin."
 {¶ 22} Howe stated that he never saw appellant put any dogs on the treadmills and never saw any dogs in the houses by the woods. He stated that although he saw the marijuana growing by the barn, he did not know who had planted it. He denied ever purchasing marijuana from appellant, even though he admitted using drugs two years before. He said he was especially upset about Riffe's accusation because he was in process of getting custody of his children from an ex-girlfriend who was a drug user. Howe stated that he thought appellant's sister, Patty, owned the Angola property.
 {¶ 23} Next, Demetria Blackshear testified. She said that she now lives at 527 Hackett Street. Prior to the raid, she had occasionally stayed at the 537 Hackett Street address. She has known appellant for 10 years and they have a two year-old child together. Blackshear stated that appellant loves animals and in the past had many different dogs which he kept on the Angola property. She stated that in December 1997, appellant was shot four to five times in the head and chest. He remained in a coma for about a month and continued to recover from his injuries over the next six months. After the shooting, she took care of the dogs and would call Stacey Howe to care for them at times. Appellant then gave a dog to her, one to his mother, and one to a man named "Jai Decembly." The rest, according to Blackshear, appellant gave to a man named "Erwin." Blackshear did not know his last name.
 {¶ 24} Blackshear stated that the Angola property was used for family outings. She stated that an outing had been held on Easter weekend, including an Easter egg hunt, horse riding, and other family-type activities. She saw Erwin feeding and tending to the dogs on occasion, but never saw him exercising them. Blackshear also stated that she saw Stacey Howe out on the property, feeding the dogs when Erwin did not arrive. Blackshear stated that Erwin had brought the pit bull to 527 Hackett Street to protect against theft of work tools left in the house during the remodeling work.
 {¶ 25} Blackshear never saw marijuana growing on the property. She stated that the alligators were kept in the fenced in pond in summer. In winter, she said they were moved into a heated barn and penned in with an enclosure made of plywood which fit together.
 {¶ 26} Blackshear said she never spoke with police after the raid and no police officer or anyone from the prosecutor's office called her. She insisted that only Ruth Jones used the master bedroom at 537 Hackett Street. Blackshear stated that she claimed her dog, a fila, which was given to her by appellant.
 {¶ 27} Ruth Jones, appellant's mother, testified that she owned 537 Hackett Street since the 1970's. She stated that at the time of the raid, she was living there with appellant and his older son. She stated that after a 1998 break-in, appellant had given her his handgun for protection. Jones indicated that since having surgery, she felt vulnerable and kept the weapon loaded in her medicine chest in the bathroom off her bedroom. She stated that appellant did not know where she kept the gun. She also said that the men's clothing found in the closet of her bedroom belonged to a friend of hers who occasionally stayed overnight. Jones also testified that she had claimed one of the dogs, a fila named "Onion," which was a family dog. She said appellant had given her this dog after he was shot and could no longer care for it.
 {¶ 28} Patricia Johnson, appellant's sister, testified that she had bought property at the Angola Road location. She stated her husband and appellant remodeled a house taken from the "Airport" relocation project. They placed the house on the unimproved Angola Road property. She stated that she originally bought the property and put it in Otis Williams' name, a man she was "sleeping with" at the time. When she and Otis broke up, she had the deed switched out of his name in 1997, but did not record it until 2000 or 2001. Johnson stated that family outings at Easter and for a nephew's birthday party occurred at the property during 1999. She stated that prior to appellant's arrest, she has seen a man named "Erwin," a tall black male on the property. Since appellant's arrest, however, she had not been out to the property. Since the raid, she asked Howe to check the property occasionally, since he lives across the road.
 {¶ 29} Appellant's veterinarian, Dr. Jack Niggemyer, then testified that he began treating appellant's dogs four to five years ago. The doctor stated that either appellant or friends would bring in the dogs, many of them puppies, for vaccinations. He stated that he was amazed to read about the charges against appellant in the newspaper, since he never saw any indications of ill treatment or suspected dog fighting. The doctor stated that he likes pit bull dogs, which are an acceptable breed, despite their reputation to be vicious. He noted that the antibiotic pills found on the Angola property were from a prescription, dated March 1999, and authorized by him. The liquid antibiotic was not, however, issued by him. Dr. Niggemyer also said that he could not tell from the state's videotape how the wounds had been made. He stated that if two dogs got in a fight for any reason, there could be puncture wounds, torn skin and ears, and injuries on the face, sides, or front and back legs. The doctor acknowledged that if he saw five or six dogs from the same location with scars and numerous wounds, he would be suspicious. He stated that he had examined the three dogs remaining at the dog pound but could not determine the cause of any of their scars. Dr. Niggemyer noted that the teeth of the dogs were unbroken and intact. He would expect that dogs used for dog fighting would have some damage to their teeth.
 {¶ 30} The next witness, Kelly Young, testified that he has owned and raised American pit bull terriers for 15 years. He also manufactures and sells dog treadmills which are used for exercising and building endurance in dogs. His clients include the Society for the Prevention of Cruelty to Animals in San Francisco and a breeder/trainer who shows dogs at the famous Westminster dog shows. Young testified that pit bulls, once bred for fighting, now have a variety of legitimate uses such as protection, search and rescue, and drug detection. He participates in confirmation shows, pulling, and agility events.
 {¶ 31} Young noted that pit bulls can be very creative about getting out of kennels and into fights. He stated that if a female is unreceptive during breeding attempts, she will turn and attack the male head-on. He also stated that the use of tow chains and car axles was an inexpensive, effective, and commonly used way to stake out pit bull dogs. The axle units provide a swivel which prevents the chain from becoming entangled around the post. He further noted that he had never heard of "post agitation" and that some pit bulls even enjoy the freedom of being chained outside. Young stated that because of their instinct for grabbing and hanging on, pit bulls love to play on spring poles — devices which have hanging strips of hide or other materials which they can jump up and grab. This activity also builds up a dog's neck and shoulders, and may be used for training purposes. Young also noted that although dogs with scars would not be permitted in confirmation events, they could very well be used in pulling competitions.
 {¶ 32} Appellant then rested. The state presented one rebuttal witness, Detective Pitzen, who had interviewed Stacey Howe for 30 to 45 minutes after the raid. According to the detective, Howe never mentioned anything about a man named "Erwin." Detective Pitzen acknowledged, however, that although he knew about them, he never interviewed Ruth Jones, Demetria Blackshear, Derrick Boyd, or James Cook, additional potential witnesses.
 {¶ 33} The jury found appellant guilty on all counts. He was sentenced to ten months on each of the six counts of dogfighting, to be served concurrently with each of the other sentences imposed in this case; three years on the conviction for illegal cultivation of marijuana, to be served consecutively to the other sentences imposed in this case; and eight months on the charge of having a weapon while under disability, to be served consecutively with all other sentences imposed in this case.
 {¶ 34} Appellant now appeals that judgment, setting forth the following six assignments of error:
 {¶ 35} "First Assignment of Error
 {¶ 36} "Mr. Jones was denied his right to a speedy trial as guaranteed by the Sixth Amendment to the United States Constitution, Section 10, Article I of the Ohio Constitution and R.C. 2945.71 in case no. CR00-1937.
 {¶ 37} "Second Assignment of Error
 {¶ 38} "The state violated Mr. Jones' right to due process when it acted in bad faith in destroying evidence that was potentially useful to Mr. Jones and favorable evidence that was material to the issue of guilt in case no. CR99-2352 and case no. CR99-2430.
 {¶ 39} "Third Assignment of Error
 {¶ 40} "The trial court erred to the prejudice of the appellant in allowing inadmissible hearsay evidence to be used against him, thereby denying him his rights under the Ohio and United States Constitutions to confrontation of the witnesses against him and due process of law and the Ohio Rules of Evidence.
 {¶ 41} "Fourth Assignment of Error
 {¶ 42} "The trial court erred by overruling appellant's motion to suppress evidence as the search warrant failed to particularly describe the place to be searched.
 {¶ 43} "Fifth Assignment of Error
 {¶ 44} "The trial court erred in denying appellant's motion to suppress marijuana plants which were seized during a warrantless search of appellant's property in violation of the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution.
 {¶ 45} "Sixth Assignment of Error
 {¶ 46} "Appellant's conviction was against the manifest weight of the evidence in case no. CR99-2352, case no. CR99-2430 and case no. CR99-2352."
 {¶ 47} We will address appellant's assignments of error out of order.
 I. {¶ 48} Appellant, in his third assignment of error, contends that the trial court erred in allowing into evidence inadmissible hearsay, denying appellant his constitutional right to confront witnesses. We agree.
 {¶ 49} Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Evid.R. 801(C); State v. Maurer (1984),15 Ohio St.3d 239, 262. Hearsay is generally not admissible except when considered an exception. See Evid.R. 803, 804, 805. Where statements are offered into evidence to explain an officer's conduct during the course of investigating a crime, such statements are generally not hearsay.State v. Thomas (1980), 61 Ohio St.2d 223, 232. There are limits, however, to this general rule because of the significant potential for abuse and potential confusion to the trier of fact. See State v. Blevins
(1987), 36 Ohio App.3d 147, 149. For example, when the statements connect the accused with the crime charged, they should generally be excluded. See State v. Culley (Aug. 31, 1989), Franklin App. No. 89AP-153, citing to Blevins, supra.
 {¶ 50} In the present case, over appellant's continuing objection, Detective Allen testified as follows:
 {¶ 51} "Q. Do you recall what information you received regarding Mr. Jones?
 {¶ 52} "A. Yes, sir.
 {¶ 53} "Q. Okay, and do you recall what that was?
 {¶ 54} "A. Yes we received information that he's heavily involved in dog fighting.
 {¶ 55} "MR. GERKEN: Objection, Your Honor. It's hearsay.
 {¶ 56} "THE COURT: Overruled.
 {¶ 57} "A. That he's heavily involved in dog fighting; that he wants to be the king of dog fighting, okay? That's what we were actually advised; that he raises and breeds dogs; that to avoid some of the municipal code laws that we have been involved in making for more than one vicious dog in the residence of the city and some of the confinement regulation that also exist within the city and within the State that he was keeping his dogs outside of the city in a lot number, and that other dogs that he was more specifically involved in training for current fights or a scheduled fight he would move around to different addresses throughout the community or keep near to him. * * *"
 {¶ 58} In our view, this testimony was presented for the sole purpose of establishing the truth of the matter asserted, i.e. that appellant was involved in breeding, training, and possession of dogs used for dogfighting. The information presented went far beyond that necessary to explain any subsequent investigation conducted by police. In our view, it was unduly prejudicial in connecting him to the crimes charged. Therefore, the trial court erred in permitting Detective Allen's hearsay statements which violated appellant's Confrontation Clause rights under both Section 10 Article I of the Ohio Constitution and the
 {¶ 59} Sixth Amendment to the United States Constitution.
 {¶ 60} We must now determine whether this error was "harmless beyond a reasonable doubt." See State v. Madrigal (2000),87 Ohio St.3d 378, 388. Our inquiry is not simply a sufficiency of the remaining evidence, but rather, if there is a "reasonable possibility that the evidence complained of might have contributed to the conviction." Id., citing to Chapman v. California (1967), 386 U.S. 18,23.
 {¶ 61} R.C. 959.16 provides that
 {¶ 62} "(a) No person shall knowingly do any of the following:
 {¶ 63} "* * *
 {¶ 64} "(3) Sell, purchase, possess, or train a dog for dogfighting; * * *."
 {¶ 65} In this case, no direct or circumstantial evidence was presented that appellant sold or purchased any dogs for the purpose of dogfighting. The only evidence of any type of dog training involved one incident of appellant being pulled around the Angola Road property while walking a dog and the discovery of treadmills and other equipment. Both the dog warden and the state's veterinarian testified that the equipment found could have legitimate dog training uses. While it is possible that such training was occurring at the Angola Road property, no evidence was presented that appellant was ever seen utilizing this equipment to create fighting dogs. In addition to appellant, many other people apparently had access to and utilized this property for a variety of purposes. In our view, the state presented no evidence of appellant training any dog for the purpose of dogfighting.
 {¶ 66} The only issue remaining is whether the evidence established that appellant "possessed" dogs for dogfighting. In this case, six of the dogs removed from the Angola Road property or 527 Hackett Street house had scars and healing wounds "consistent with dogfighting." Both the dog warden and the state's veterinarian acknowledged that although the wounds and scars indicated repeated fight incidents, nothing indicated that such injuries were created only by organized dogfighting. Nevertheless, these injuries, coupled with the circumstantial evidence of the treadmills, the plywood pen, the spring device, and the dog houses with axle-chain tie-ups, provide sufficient evidence from which a jury could find that the dogs were being used for dog fighting.
 {¶ 67} More problematic, however, is the evidence of whether appellant actually "possessed" the dogs. Since "possession" is not defined as it pertains to the dogfighting statutes, we turn to the definitions provided in R.C. Chapter 2925 pertaining to drug offenses for some guidance. R.C. 2925.01(K) states:
 {¶ 68} "`Possess' or `possession' means having control over a thing or substance but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found". When words are not statutorily defined, we also look to the common meaning and usage. Webster's Dictionary, 10th Edition, defines "possession" as "the act of having or taking into control; control or occupancy of property without regard to ownership." Thus, proof of "possession" requires a demonstration of control over the property.
 {¶ 69} Some of the witnesses used confusing terms, often referring to "harboring" as a criterion in connection with dogfighting. A "harborer" is one who has possession and control over the premises where the dog lives and silently acquiesces in the dog's presence. Flint v.Holbrook (1992), 80 Ohio App.3d 21, 25. "Harboring," however, pertains only to the statutes regarding the ownership, confinement and insurance of vicious dogs and is, thus, inapplicable to the present case. See R.C.955.22, et seq.
 {¶ 70} In the present case, none of the dogs removed from either property were directly connected to appellant by either ownership or direct contact. Detective Allen was "reasonably sure" that the black and white dog seen with appellant in February 1999 was the same dog as the one picked up from 527 Hackett Street. He could not, however, be absolutely certain. Appellant was seen only twice with a dog on the Angola Road property.
 {¶ 71} We note that although a great deal of testimony was presented, much of the evidence involved observations of innocuous behavior or vague innuendo, as it pertained to appellant's alleged involvement in dog fighting activities. The only testimony or evidence which directly linked appellant to dog fighting was the inadmissible testimony of Detective Allen relating statements made by some unknown person. In our view, without this testimony, there is a reasonable possibility that the outcome of the trial may have been different. Consequently, the trial court's error was not harmless beyond a reasonable doubt. Therefore, appellant's convictions for possession of dogs used for dog fighting must be reversed and remanded for a new trial.
 {¶ 72} Accordingly, appellant's third assignment of error is well-taken.
 II. {¶ 73} Appellant, in his fourth assignment of error, claims that the trial court erred in denying his motion to suppress evidence taken in the search of the Hackett Street and Angola Road properties. Appellant contends that the Hackett Street warrants were improperly issued because of the inclusion of an incorrect address, precluding the Toledo Municipal Court from having jurisdiction to issue the warrant. He further asserts that the Angola Road warrant fails because it lists only one address when two other addresses were searched.
 {¶ 74} A search warrant which contains an incorrect address will not preclude admission of evidence discovered during a search where the warrant contained sufficient description and there was no possibility that the wrong property would be searched. See State v. Dore (1992),79 Ohio App.3d 466, 468, citing to United States v. Gordon (C.A.5, 1990), 901 F.2d 48 (incorrect street name was not a "facial defect" precluding admission of evidence under good faith exception). See also,United States v. Burke (C.A.11, 1986), 784 F.2d 1090, 1093 (search warrant containing incorrect address was valid because proper location was identified and officer's reasonable belief that warrant was properly issued incompliance with Fourth Amendment); U.S. v. McCain (1982),677 F.2d 657 (suppression was not required even though the search warrant contained the wrong address).
 {¶ 75} In this case, although the city name on the warrant for the Hackett Street properties was incorrectly typed as "Holland, OH," the street address properly referred to the Toledo, Ohio location which was, in fact, the property which was intended to be and actually was searched. The warrants specifically referred to adjacent streets and intersections located within Toledo. In our view, the description in the affidavit was sufficiently clear to enable the police officers to locate, identify, and search the proper property.
 {¶ 76} Furthermore, although "Holland," the city listed on the warrant, may have been beyond the jurisdiction of the Toledo Municipal Court, the actual property referred to and searched was not. The "mistake" in the address did not cause any misunderstanding or misguide anyone in the issuance and execution of the search warrant. Therefore, we conclude that the trial court did not err in denying appellant's motion to suppress evidence as a result of the Hackett Street search warrants which partially listed the wrong address.
 {¶ 77} As for the Angola Road property, generally, a warrant that has been issued for one building or house cannot be used to search another address. See R.C. 2935.12; Crim.R. 41. Nevertheless, the United States Supreme Court established a good faith exception to this requirement stating that evidence obtained pursuant to an improper search warrant should not be suppressed if the police relied in good faith on the validity of the search warrant. See United States v. Leon (1984)468 U.S. 897; State v. Carter (1994), 69 Ohio St.3d 57.
 {¶ 78} In this case, the evidence presented shows that although the properties searched may have been technically designated as three separate addresses, all three properties appeared to be part of one parcel. Only one mailbox was placed in front of the house area. In addition, several of the buildings not only appeared to belong together but were located over the lot line of two adjacent parcels and appeared to belong with the house property. Moreover, evidence was submitted that appellant was purchasing all three properties as one unit on land contract. Consequently, when requesting and receiving the search warrant, the officer serving the warrant relied in good faith on the appearance that only one address applied to all of the outbuildings and property searched. Therefore, the trial court did not err in denying appellant's motion to suppress the evidence found as a result of the Angola Road search warrant.
 {¶ 79} Accordingly, appellant's fourth assignment of error is not well-taken.
 III. {¶ 80} Appellant, in his second assignment of error, contends that his right to due process was infringed because the state failed to preserve evidence, i.e. the dogs removed by the dog warden, that was potentially material to the issue of guilt.
 {¶ 81} "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v. Youngblood
(1988), 488 U.S. 51, 58. See also, State v. Treesh (2001),90 Ohio St.3d 460, 475.
 {¶ 82} In this case, appellant was notified several times of the opportunity to have the dogs examined by his own expert or veterinarian. Appellant's counsel failed to arrange for such an examination within a reasonable time. The state preserved the evidence by making a video tape of its expert examining and diagnosing the dogs' injuries. In order to save costs, the unclaimed dogs were then euthanized. While we agree that the better course of action would have been to preserve the dogs until after trial, we cannot say that the actions of the state or the dog warden constituted a willful, bad faith destruction of evidence. Appellant was able to cross-examine the state's expert as to how the injuries occurred. He also rebutted that testimony with his own expert. Therefore, we cannot say that the destruction of the dogs constituted a denial of appellant's due process rights.
 {¶ 83} Accordingly, appellant's second assignment of error is not well-taken.
 IV. {¶ 84} Appellant, in his fifth assignment of error, argues that the trial court erred in failing to suppress evidence involving the seizure of marijuana plants found growing on appellant's property.
 {¶ 85} "Warrantless searches are `per se unreasonable under theFourth Amendment — subject only to a few specially established and well-delineated exceptions.'" State v. Kessler (1978), 53 Ohio St.2d 204,207. Warrants may not be required, however, if the interest is not protected by the Fourth Amendment or if a recognized exception applies. The Fourth Amendment does not apply to things exposed to public view.Katz v. United States (1967), 389 U.S. 347, 351. There is no recognized privacy expectation in an open field outside a residence. See Oliver v.United States (1984), 466 U.S. 170, 180-181.
 {¶ 86} For example, police officers do not need a warrant, or an exception, to search for or seize marijuana plants or a still found in an open field under the "open view" doctrine. See Oliver, supra; Hester v.United States (1924), 265 U.S. 57. In these situations, there is no search because police can observe the item without physically intruding into a constitutionally protected area. State v. Harris (1994),98 Ohio App.3d 543, 546-547.
 {¶ 87} The common law, however, distinguished "open fields" from the "curtilage," the land immediately surrounding and associated with the home. Hester, supra at 59. "At common law, the curtilage is the area to which extends the intimate activity associated with the `sanctity of a man's home and the privacies of life.'" Oliver, supra, at 180 (quotingBoyd v. United States (1886), 116 U.S. 616, 630). The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened. Nevertheless, even the "curtilage" area of a residence may not be protected when that area is open to public view. State v. Staton (Mar. 15, 1991), Greene App. No. 90-CA-62, citing to California v. Ciraolo
(1986), 476 U.S. 207, 212-213. See, also, Katz, supra.
 {¶ 88} In this case, police officers in a helicopter flying in a public navigable airspace were able to observe plants which were discernible as marijuana. These plants were located in open areas near the barns or outbuildings, which were away from the house. A dried marijuana plant was hanging in plain view on an open door of one of the barns. None of the plants observed by the officers in the helicopter was close to the house or in what could reasonably be considered the curtilage.
 {¶ 89} Additionally, the ground crew that seized the plants did not enter into the buildings or search any areas which were subsequently covered by the search warrant for the Angola Road properties. In our view, it was unreasonable that appellant would expect that the marijuana plants were constitutionally protected from being observed with the naked eye. Thus, under the open fields doctrine, the police were not required to obtain a warrant before entering onto appellant's property and seizing the marijuana growing outside. Therefore, the trial court did not abuse its discretion in denying appellant's motion to suppress the evidence obtained as a result of the cutting and seizing of the marijuana plants.
 {¶ 90} Accordingly, appellant's fifth assignment of error is not well-taken.
 V. {¶ 91} Appellant, in his sixth assignment of error, argues that the convictions for all three cases were against the manifest weight of the evidence. While not specifically designated as such, appellant's argument also encompasses the sufficiency of the evidence as to the elements of the crimes charged. We have already determined that the convictions as to the possession of fighting dogs must be reversed and remanded. We turn now to the convictions for having a weapon while under disability and cultivation of marijuana.
 {¶ 92} The Supreme Court of Ohio has ruled that "the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins
(1997), 78 Ohio St.3d 380, paragraph two of the syllabus.
 {¶ 93} "Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. Id. at 386. Upon review of the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. If a defendant's conviction is reversed based upon the sufficiency of the evidence, the defendant's conviction is reversed, with prejudice. See Thompkins, supra at 388.
 {¶ 94} However, under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. Thompkins, supra at 387. The appellate court,
 {¶ 95} "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 96} The Supreme Court of Ohio has ruled that circumstantial evidence is subject to the same standard of proof as direct evidence.State v. Jenks (1991), 61 Ohio St.3d 259, paragraph one of the syllabus. The standard to be applied on appeal is "to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus.
 {¶ 97} We will now address appellant's conviction for having a weapon while under disability. R.C. 2923.13(A)(2) provides that "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for * * * any felony offense of violence * * *." In order to "have" a firearm within the meaning of R.C. 2923.13, a person must actually or constructively possess it. State v. Hardy (1978), 60 Ohio App.2d 325,327. "`Actual possession requires ownership and, or, physical control .'" (Emphasis added.) State v. Messer (1995), 107 Ohio App.3d 51, 56, quotingHardy, supra. Constructive possession requires immediate access to the weapon. State v. Butler (1989), 42 Ohio St.3d 174, 176. The use of circumstantial evidence may support a finding of constructive possession. See State v. Grundy (Dec. 9, 1998), Summit App. No. 19016. Mere access to the weapon can establish guilt, that is, ownership is not a prerequisite to determining whether someone "had" the weapon. State v.Hussing (Jan. 27, 1994), Cuyahoga App. No. 63838.
 {¶ 98} In this case, it is undisputed that appellant was under indictment for a felony offense of violence, at the time that the 9mm Beretta was found at 537 Hackett Street. The evidence showed that appellant is the registered owner of the handgun found in the medicine cabinet. This alone establishes actual possession. In addition, the gun was found in an area very accessible to appellant. Despite appellant's mother's testimony that appellant gave the gun to her for protection, evidence was presented from which the jury could have found that he also constructively possessed the gun. Therefore, the conviction for having a weapon while under disability is not against the manifest weight of the evidence and there exists sufficient evidence to establish the elements of the offense.
 {¶ 99} Finally, we examine appellant's conviction for the cultivation of marijuana. R.C. 2925.04 provides, in pertinent part, that:
 {¶ 100} "(a) No person shall knowingly cultivate marihuana or knowingly manufacture or otherwise engage in any part of the production of a controlled substance."
 {¶ 101} "Cultivate" includes "planting, watering, fertilizing, or tilling." R.C. 2925.01(F). "Manufacture" means to "plant, cultivate, harvest, process, make, prepare, or otherwise engage in any part of the production of a drug, by propagation, extraction, chemical synthesis, or compounding, or any combination of the same, and includes packaging, repackaging, labeling, and other activities incident to production." R.C. 2925.01(J).
 {¶ 102} While the definitions of "cultivate" and "manufacture," do not expressly refer to the term "possession," the actions listed imply, necessarily, some degree of control over or possession of the illegal substance. See State v. Blair (Dec. 4, 1997), Meigs App. No. 96 CA 27. Standing alone, the mere ownership or leasing of property, may not be sufficient to establish an accused's involvement or possession of an illegal substance, especially where the property is accessible to others. See State v. Haynes (1971), 25 Ohio St.2d 264, 270-271 (evidence as to lessee of premises where drugs found will not establish his possession for sale of narcotics, particularly where premises are also occupied by other persons).
 {¶ 103} In this case, no direct evidence was presented that appellant planted, watered, fertilized, or tilled the marijuana which was found growing on the land he was purchasing. The only circumstantial evidence presented was testimony that a year and a half earlier, appellant allegedly sold a baggie of marijuana to Stacey Howe and that a small amount of marijuana was found at appellant's residence. In addition, although appellant occasionally visited the Angola Road property, according to Detective Allen, there were months at a time when appellant was not seen there at all. This fact undercuts the inference that appellant was tending marijuana plants. Again, while we agree that the evidence indicates that the marijuana was being purposefully grown by someone, appellant's mere presence on the property, without more, does not establish that he was the person who cultivated the marijuana, especially considering the regular access by other persons. Therefore, we conclude that the conviction was also not supported by the evidence and, furthermore, was against the manifest weight of the evidence. Appellant's sixth assignment of error is well-taken as it pertains to the marijuana cultivation conviction, but is not well-taken as to the having a weapon while under disability conviction and the dog fighting convictions.
 {¶ 104} In light of our disposition of the second, third, fourth, and sixth assignments of error, appellant's remaining assignments of error, Nos. I and V, are hereby rendered moot.
 {¶ 105} The judgment of the Lucas County Court of Common Pleas is affirmed in part and reversed in part. This case is remanded to the trial court for proceedings consistent with this decision. Court costs of this appeal are assessed equally between the parties.
JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART.
Peter M. Handwork, P.J., Melvin L. Resnick, J., James R. Sherck, J., CONCUR.